MURDOCK, Judge.
These appeals, which are more correctly classified as an appeal and a cross-appeal, see discussion infra, involve a custody dispute between D.M., who is the mother of A.M., and L.R.M. and J.M., who are A.M.’s paternal great-grandparents. In the underlying proceedings before the Cherokee Juvenile Court, the mother, the paternal great-grandparents, and AM.’s father all sought custody of A.M. The juvenile court awarded custody to the mother, awarded the father supervised visitation, and awarded the paternal great-grandparents standard visitation. We note that the father has not appealed from the juvenile court’s judgment.
The mother and the father began dating in January 2002. Their daughter, A.M., was born in May 2003. A few days after A.M.’s birth, the mother graduated from high school. The mother and A.M. resided with A.M.’s maternal grandmother in Cedar Bluff. The father resided with the paternal great-grandparents, who had raised him, in Jamestown.
In September 2003, the father and the mother, who were both approximately 19 years old, married. After their marriage, the father, the mother, and A.M. resided in a home next door to the paternal great-grandparents. It is undisputed that A.M. spent almost all of the time between September 2003 and the end of May 2004 in the paternal great-grandmother’s care. It is also undisputed that the mother spent the night with the paternal great-grandparents on occasion and that the mother spent many days in the paternal great-grandparents’ home with A.M.
The above-described care arrangement was attributable, in part, to the father’s insistence that the mother leave A.M. with the paternal great-grandparents because A.M. interrupted his sleep. The father has a history of drug problems, and he has a violent temper. Based on the evidence presented to the juvenile court, it could have found that the young mother was in the unenviable position of acceding to the father’s desires or facing unpleasant consequences for her and the child. For example, on one occasion, the father actually struck A.M. when he and the mother got into an argument in bed. Also, on three occasions during the few months that the mother and the father resided together, they separated because of domestic violence committed by the father against the mother. On each occasion, the mother took A.M. and they resided with the maternal grandmother for a few days.
Except for the three brief periods of separation described above, the father and the mother resided together between September 2003 and early April 2004, when they permanently separated. During the time that the father and the mother resided together, they regularly used marijuana and they also used methamphetamine. It appears, however, that the mother’s drug use was heavily influenced by her relationship with the father. Unlike the father, the mother did not use drugs before she met the father, and she apparently ceased using drugs after she and the father separated in April 2004. The mother also did not use drugs from July 2002, when she suspected that she was pregnant with A.M., until the parties married and began residing together in September 2003. Also, the first time that the mother used methamphetamine was one month after she observed the father using that drug and after she and the father had married.
As stated above, the father and the mother separated in April 2004. Thereafter, the mother moved back into the ma *867 ternal grandmother’s home, and the mother began working at a local restaurant. The mother continued to leave A.M. in the paternal great-grandmother’s care much of the time because of her erratic work schedule and because of disagreements between she and the father about who should care for A.M. The mother testified that occasionally she had to be at work at 5:00 a.m. and that she would leave A.M. with the paternal great-grandmother overnight because she did not want A.M. to have to wake up that early. The mother also testified that when she attempted to leave A.M. in the maternal grandmother’s care, the father would obtain A.M. from the maternal grandmother and take her to the paternal great-grandmother’s home while the mother was at work.
In early June 2004, the mother moved with A.M. to Rome, Georgia, where the mother had resided in the past and where her younger sister and some of the mother’s extended family still resided.[1] The mother moved into a public-housing apartment located next door to her sister’s public-housing apartment. Not long after the mother moved to Rome with A.M., she arranged for the paternal great-grandparents to retrieve A.M. for a weekend visit. The paternal great-grandparents returned A.M. to the mother after the weekend visit.
Approximately three days after the paternal great-grandparents returned A.M., the father went to Rome to visit A.M. According to the mother, when the father arrived she was preparing to take A.M. to a doctor because A.M. had developed a rash after a recent inoculation. Upon his arrival, the father stated that he would take A.M. to a doctor instead. Thereafter, the father took A.M. to the paternal great-grandparents’ home; the paternal great-grandparents subsequently took the child to a doctor.
Two days after the father left A.M. with the paternal great-grandparents, he filed a complaint for a divorce in the Cherokee Circuit Court (case number DR-04-80). The father alleged various grounds for divorce, and he alleged that the mother had abandoned A.M. to the paternal great-grandmother. The father also alleged that the mother had “been in the company of known drug users with the child [and that she] .... currently resides in a two bedroom apartment with five people residing therein where parties are engaging in deviate, inter-racial sexual acts, homosexual acts, consuming drugs and endangering the health, safety and welfare of [A.M.].” The father requested that he be awarded “immediate ex parte custody” of A.M. and that he be awarded permanent custody of A.M. In support of his complaint, the father filed an affidavit from the paternal great-grandmother. The affidavit stated:
“That I have been the primary caregiver for the minor child made the basis of this action with the child sleeping in my home and providing all of the activities of daily living for the child since September, 2003. That the ... mother of the minor child is not gainfully employed, has provided little or no support or maintenance for the minor child and has failed to provide medical attention for the minor child.
“That on or about April, 2004, the [mother] confided in me and advised me that she was associating with known drug users ... and that the said individuals were engaging in deviate, interracial homosexual relations. That one [AIM.] is a known drug user.
“That on June 11, 2004, the [mother] asked me to meet her in Rome, Georgia *868 to pick up the child and when I found the minor child she suffered from a severe diaper rash. That on June 16, 2004 the [father] brought the minor child to my home and the child was covered in a severe body rash due to an allergic reaction wherein I sought immediate medical attention for the minor child on that date. That the [mother] has failed to provide adequate nutrition for the minor child.
[[Image here]]
“It is my belief that the [mother] is both physically and mentally unable and unwilling to care for the minor child....
“I believe that the minor child in the custody of the [mother] would be endangered and at risk for serious physical, emotional and psychological injury.”
In conjunction with his divorce complaint, the father also filed a motion requesting the entry of several pendente lite orders, including an order for pendente lite custody of A.M. On the day that the father filed his complaint and motion, the circuit court entered an ex parte order awarding the father “temporary custody” of A.M. and setting his motion for a hearing to be held on August 2, 2004.
In July 2004, the paternal great-grandparents filed a “Petition to Intervene and Complaint by Intervenors.” They alleged that A.M. had “primarily lived and slept in their home since her birth” and that “[n]ot to allow the intervention could cause significant harm to” A.M. The paternal great-grandparents requested that they be considered an “alternative placement” for A.M. should the court determine that neither the mother nor the father “would be a proper party to have the full care, custody and control” of A.M. The circuit court granted the motion to intervene.
Also in July 2004, the mother, who had repeatedly requested that A.M. be returned to her and who had obtained an attorney from “Legal Services Alabama,” filed an answer and a counterclaim for a divorce. The mother conceded in her pleadings that A.M. was the father’s child. She requested that the circuit court enter an order divorcing her and the father, awarding her custody of A.M., awarding her child support, and dividing the marital property.
In August 2004, after a hearing on the father’s motion for pendente lite orders, the circuit court entered an order that stated that A.M. was the mother’s and father’s child but that they “did not establish a common law marriage prior to the birth of the child. [A.M.] is not, therefore, a child of the marriage of this Plaintiff and Defendant.” The circuit court concluded that it did “not have jurisdiction to determine the issues of custody, visitation and child support of this child which are contested by these parties.” It then severed the issues of custody, visitation, and child support from the divorce action, and it transferred those matters to the Cherokee Juvenile Court.[2] The circuit court placed *869 “the divorce case ... on the inactive docket pending the motion of either party.”
The juvenile court assigned the transferred proceeding case number JU-04-243.01. Approximately two months after the custody, visitation, and child-support issues were “severed and transferred” to the juvenile court, the father filed a “Motion to Have the Juvenile Court Assume Jurisdiction.” He alleged that A.M. was “a dependent child due to the faults and habits of the ... mother” and that he was “the fit and proper person to have care, custody and control of’ A.M. The father requested that the juvenile court “assume jurisdiction of this cause,” that it award him custody of the child, and that it require the mother to pay him child support.
In December 2004, the juvenile court held a hearing on the father’s motion to assume jurisdiction. It thereafter entered a “Temporary Order” that stated:
“1. That paternity of [A.M.] has been acknowledged by the parties and that [the father] is hereby adjudged to be the father of [A.M.]
“2. That the Department of Human Resources is Ordered to conduct a home study/evaluation of the homes of the parties and to report the same to this Court.
“3. That the ... [father and the mother] are Ordered to report to the Cherokee County Court Referral and register with the Court Referral Color Code Program.
“4. That the [father and the mother] are to register with the Department of Human Resources/Child Advocacy Center parenting classes and are to complete the parenting class program and report to this Court upon completion of the same.[3]
[[Image here]]
“5. That the parties shall continue to interact with each other and the child in the manner that they have ... pending further Orders of the Court.
“7. That [the mother] is to have reasonable visitation as the parties have agreed.”
In May 2005, the paternal great-grandparents filed an “Amended Petition” in both the divorce action pending before the circuit court and in the juvenile-court proceeding. In addition to the allegations contained in their original intervention petition, the paternal great-grandparents alleged:
“2. That [the paternal great-grandparents] have provided the primary care for said child since her birth.... The minor child has primarily lived and slept in their home since her birth and the [father] and [the mother] have acquiesced to this custodial situation since the child’s birth.
“3. That it would be in the best interest of said minor child under the provisions of [Ex parte McLendon, 455 So.2d 863 (Ala.1984),] that said minor child be awarded to [the paternal great-grandparents].
“4. That neither the [father] nor the [mother] exercised their parental duties *870 toward said minor child nor met their responsibilities for said minor child. Neither the [father] nor the [mother] are fit and proper parties to have the custody of said minor child. That [the paternal great-grandparents] would be the proper and fit parties to have the full care, custody and control of said minor child.”
A few days after the paternal great-grandparents filed their amended petition, the presiding judge of the circuit court assigned the pending divorce action to the district court judge who was conducting the juvenile-court proceeding.[4]
After the reassignment of the divorce action, the trial judge conducted a consolidated ore tenus proceeding over two days, one day in July 2005 and one day in September 2005. During the July 2005 hearing, the mother and the father were required to submit to a drug test. The mother tested negative for the presence of all drugs; the father tested positive for the presence of marijuana and cocaine.
After the July 2005 hearing, the trial court entered an “Amended Temporary Order” that awarded pendente lite custody of A.M. to the paternal great-grandparents on the condition that the father not reside with them, that awarded the father supervised visitation with A.M., and that awarded the mother unsupervised visitation with A.M. for one day every other weekend, in addition to telephone visitation. We note that testimony at the July 2005 hearing reflected that the paternal great-grandparents had allowed the mother to visit with A.M. but had not allowed her to take A.M. from their home.
After the September 2005 hearing, the trial court rendered a judgment that states:
“1. That for a period of six months custody shall remain with the [paternal great-grandparents] ... on the condition that the father ... not reside in the home.
“2. That the father ... shall have supervised visitation only in the home of [the paternal great-grandparents]; to be arranged between the parties.
“3. That the mother ... shall have visitation every weekend for a period of three months, with the exception of Christmas 2005, on which the mother shall have the child until 5:00 p.m. Christmas eve; at the end of three months the mother shall have the child from Sunday at 6:00 p.m. until Friday at 6:00 p.m., with the child returning to the [paternal great-grandparents’] home every weekend.
“4. At the end of the six months period, custody shall be returned to the mother ... with the [paternal great-grandparents] to have the following visitation:
“A. Three weekends per month....
“B. Four hours on the child’s birthday.
“C. [Description of Christmas visitation schedule omitted.]
“D. One half of Spring Break.
“E. [Description of Thanksgiving visitation schedule omitted.]
“F. Father ... shall have visitation at [the paternal great-grandparents’] home on Father’s Day, regardless of *871 other provisions of the Decree and mother shall have Mother’s Day.”
On October 12, 2005, the circuit court clerk filed the trial court’s judgment in both the juvenile-court action and the divorce action.
The mother filed a postjudgment motion in the juvenile-court action, arguing in part that the juvenile court erred by leaving custody with the paternal great-grandparents for six months and that it erred by awarding the paternal great-grandparents visitation. The paternal great-grandparents presented a postjudgment motion that was styled for both the juvenile-court action and the divorce action, but the court clerk, who served for both the circuit court and the district court, see Ala.Code 1975, § 12-17-160, entered the motion in only the divorce action. In their postjudgment motion, the paternal great-grandparents argued that the mother had failed to meet her burden of proof under Ex parte McLendon, 455 So.2d 863 (Ala.1984). They also requested that the juvenile court amend its order to make a specific finding of dependency and that it award them custody of A.M. Further, the paternal great-grandparents presented a motion for a stay of the judgment pending appeal. Like their postjudgment motion, the motion for a stay was styled for both the juvenile-court action and the divorce action, but the court clerk entered it in only the divorce action.
On the date that she filed her post-judgment motion, the mother also filed a notice of appeal in the juvenile court. On the date that they filed their postjudgment motion, the paternal great-grandparents delivered a notice of appeal to the court clerk who, as stated above, accepted filings for both the juvenile court and the circuit court. The paternal great-grandparents’ notice of appeal contained a caption referencing the circuit court and the case number for the divorce action pending in the circuit court; the caption did not reference the juvenile court or the case number for the juvenile-court proceeding. However, the paternal great-grandparents’ notice of appeal stated that the “final judgment” being appealed from was the judgment “denying petition for child custody & other relief filed by [the paternal great-grandparents] & granting child custody to [the mother] and visitation to [the paternal great-grandparents],” issues that were only before the juvenile court. The court clerk filed the paternal great-grandparents’ notice of appeal in the divorce action.
After a hearing on the postjudgment motions, an “Amended Order” was rendered that specifically stated that A.M. was not a dependent child and that the mother was not unfit. The amended order also denied “all pending motions.”[5] The amended order did not purport to address any of the issues pending in the circuit court; in particular, the amended order did not purport to address the issues of divorce or the division of marital property. The amended order was styled for both the juvenile-court action and the divorce action, but the court clerk entered the amended order only in the divorce action.
On appeal, the paternal great-grandparents contend that the juvenile court erred by affording the mother her custodial presumption as a natural parent because, they say, she had abandoned A.M., she had voluntarily relinquished custody of A.M. to them, and she was an unfit parent. They also argue that the mother *872 lost her custodial presumption as the result of the juvenile court’s December 2004 and July 2005 orders and that she had no such presumption because this case involved a dependency proceeding. Further, they argue that the juvenile court’s order is unsupported by the evidence.[6] In her appeal, the mother contends that the juvenile court erred when it awarded the paternal great-grandparents visitation with A.M.[7]
Before addressing the merits of the paternal great-grandparents’ appeal, we must first determine whether the paternal great-grandparents filed a notice of appeal as to the juvenile court’s judgment. After thoughtfully considering the somewhat confusing record,[8] we believe that the only reasonable conclusion is that the paternal great-grandparents’ filed a timely notice of appeal from the juvenile court’s October 2005 judgment, but they made mistakes in the caption of their notice of appeal such that the court clerk entered it in the wrong action.[9]
Rule 1, Ala. R.App. P., states that the rules of appellate procedure “shall be construed so as to assure the just, speedy, and inexpensive determination of every appellate proceeding on its merits.” In regard to the filing requirements for a notice of appeal, Rule 3, Ala. R.App. P., states that certain errors in a notice of appeal are to be treated as remediable clerical errors, though it does not specifically address the affect of an error as to the designation of the court that entered the judgment or an *873 error as to the case number. Nevertheless, our Supreme Court has stated that
“[t]he only jurisdictional prerequisite for an appeal is the timely filing of a notice of appeal.... The Alabama Rules of Appellate Procedure were not ‘designed to catch the unwary on technicalities.’ ... Accordingly, absent a showing that the alleged defect in a notice of appeal prejudiced the adverse party, an appeal will not be dismissed on the basis of that defect.”
Dunning v. New England Life Ins. Co., 890 So.2d 92, 96 (Ala.2003) (quoting Edmondson v. Blakey, 341 So.2d 481, 484 (Ala.1976)) (emphasis added); cf. 5A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1321 (2004) (stating that errors in the caption are generally nonfatal, formal errors, particularly where the other party has not been prejudiced by the error). See also Marsh v. Butler County, 268 F.3d 1014, 1023 n. 4 (11th Cir.2001) (“The caption is chiefly for the court’s administrative convenience.”).
The paternal great-grandparents’ notice of appeal was presented to the court clerk and stamped filed within 14 days of the entry of the October 2005 judgment. See Rule 28(A), Ala. R. Juv. P. Also, the notice of appeal was served on all parties, and the mother has not argued that she was prejudiced by the mistakes contained in the notice of appeal. Based on our review of the record and the foregoing authorities, we cannot conclude that the paternal great-grandparents’ mistakes should result in the dismissal of their appeal. Instead, we conclude that the paternal great-grandparents’ notice of appeal must be treated as a cross-appeal in the juvenile-court action.[10]
As to the merits of the paternal great-grandparents’ cross-appeal, this appears to have been a difficult case for he juvenile court. The resolution of the case depended to a great degree upon the choice of whether to believe the testimony of a young mother, who has a less than stellar past and who is apparently not an ideal parent, or a paternal great-grandmother, who was apparently prone to exaggeration and not entirely credible. The juvenile court could also have concluded that the paternal great-grandmother was susceptible to the father’s influence and that she might not be sufficiently vigilant in protecting the child from risks posed by the father.
Except for questions of law, which this court reviews de novo, when the trial court’s findings are based on evidence received ore tenus,
“ ‘[o]ur standard of review is very limited.... A custody determination of the trial court entered upon oral testimony is accorded a presumption of correctness on appeal, and we will not reverse unless the evidence so fails to support the determination that it is plainly and palpably wrong, or unless an abuse of the trial court’s discretion is shown. To substitute our judgment for that of the trial court would be to reweigh the evidence. This Alabama law does not allow.’ ”
Ex parte Perkins, 646 So.2d 46, 47 (Ala.1994) (citations omitted) (quoting Phillips v. Phillips, 622 So.2d 410, 412 (Ala.Civ.App.1993)). “It is our duty to affirm the trial court’s judgment if it is fairly supported by credible evidence, ‘regardless of our own view of that evidence or whether we would have reached a different result *874 had we been the trial judge.’ ” Griggs v. Griggs, 638 So.2d 916, 918-919 (Ala.Civ.App.1994) (quoting Young v. Young, 376 So.2d 737, 739 (Ala.Civ.App.1979)). Likewise,
“appellate courts are not allowed to substitute their own judgment for that of the trial court if the trial court’s decision is supported by reasonable inferences to be drawn from the evidence.... The reason for giving such deference to the trial judge’s findings based on disputed evidence in ore tenus proceedings is that the trial judge has the benefit of observing the witnesses’ manner and demeanor and has the better opportunity to pass upon the credibility of their testimony.”
Ex parte Pielach, 681 So.2d 154, 154-55 (Ala.1996) (citations omitted). Also, when a trial court has made no express findings of fact, this court will assume that the trial court made those findings necessary to support its judgment. See Ex parte Patronas, 693 So.2d 473, 475 (Ala.1997).
As to the paternal great-grandparents’ arguments, the juvenile court’s finding that A.M. was not a dependent child is supported by the evidence. Further, the juvenile court’s December 2004 order and its July 2005 order were not custody awards that resulted in the loss of the mother’s custodial presumption. The orders were pendente lite orders that did not, of themselves, affect a change in the custodial presumption in favor of the mother as A.M.’s natural parent. See P.B. v. P.C., 946 So.2d 896 (Ala.Civ.App.2006); Sims v. Sims, 515 So.2d 1, 2-3 (Ala.Civ.App.1987).
The remaining issues raised by the paternal great-grandparents are whether the evidence fails to support (1) an implicit finding that the mother had not voluntarily relinquished custody of A.M. to the paternal great-grandparents, (2) an implicit finding that she had not abandoned A.M. to the paternal great-grandparents, and (3) an explicit finding that the mother was not unfit to have custody of A.M. The burden was on the paternal great-grandparents to present “clear and convincing evidence” on the issues of abandonment, voluntary relinquishment, or unfitness in order to overcome the strong custodial presumption in favor of the mother. See, e.g., Ex parte G.C., 924 So.2d 651, 656 (Ala.2005); K.C. v. D.C., 891 So.2d 346, 348-49 (Ala.Civ.App.2004).
As to the first two of the aforementioned issues, any abandonment or voluntary relinquishment by the mother would have had to have occurred between September 2003 and early June 2004, when the mother moved to Rome with A.M. During that time, the mother was heavily influenced by the father and it appears that her decision as to A.M.’s care was not entirely voluntary. Also, and perhaps more importantly, the paternal great-grandparents’ own actions indicate that they did not believe the mother had abandoned A.M. or that she had voluntarily relinquished custody to them. Each time the mother separated from the father she took A.M. with her to reside with the maternal grandmother. There is no evidence indicating that the paternal great-grandparents objected to the mother’s taking A.M. Likewise, when the mother decided to move to Rome with A.M., the paternal great-grandparents did not assert that she had abandoned A.M. to them or had relinquished custody of A.M. to them. Instead, they acquiesced in the mother’s decision and even returned A.M. to the mother after A.M. had visited with them over a weekend. Further, the record contains a handwritten note from the paternal great-grandmother in which she states, “I baby-sit [A.M.] while [the mother] works.” The paternal great-grandmother’s babysitting duties must have occurred between April 2004 and the time *875 the mother moved to Rome with A.M. because that was the only time that the mother worked when A.M. was in the paternal great-grandmother’s care.
Likewise, as to the juvenile court’s explicit finding that the mother was not unfit, we note that the juvenile court was not called upon to decide simply whether the mother might have been unfit at some time in the past. It was called upon to decide whether the mother was presently unfit to exercise her parental responsibilities in light of all of the evidence presented. See, e.g., Michael v. Swords, 568 So.2d 836 (Ala.Civ.App.1990). Though there was significant evidence of the mother’s past misconduct, the record reflects that much of her past misconduct was attributable to the influence of the father. Since her April 2004 separation from the father, the young, relatively unskilled mother had stopped using drugs. Also, she had managed to provide a home for, and to care for, another child, albeit with family and public assistance.[11] According to the social worker who directed the Child Advocacy Center classes, the mother had also demonstrated the requisite skills and intentions to put A.M.’s interests first. The mother testified that she had financial resources to provide for A.M. and to meet A.M.’s material needs. Further, the mother was actively seeking employment, and she apparently had managed to maintain a close relationship with A.M. in the face of a less than welcoming environment. The mother’s uncontradicted testimony was that A.M. cried for her when she left her at the end of visitation at the paternal great-grandparents.
We do not think a further recitation of the evidence in the present case is warranted. As stated above, the issue is not whether this court would have made the same decision as the juvenile court had we been sitting in its place. The issue is whether the juvenile court’s findings are unsupported by the evidence so as to be plainly and palpably wrong. We cannot conclude that they are. Thus, we must affirm the juvenile court’s judgment as to its custody award to the mother.
As to the mother’s argument that the trial court erred when it awarded the paternal great-grandparents’ visitation rights, the grandparent-visitation statute does not purport to authorize visitation awards to great-grandparents. See Ala. Code 1975, § 30-3-4.1. Our courts cannot “broaden the coverage of § 30-3^4.1 ... to include persons not contemplated by the act.” T.R.S.S. v. R.S., 828 So.2d 327, 330 (Ala.Civ.App.2002). As to the issue of great-grandparent visitation, therefore, the trial court’s judgment is due to be reversed.[12]
As to the mother’s appeal, the juvenile court’s judgment is hereby reversed and the cause remanded for the juvenile court to enter a judgment consistent with this opinion. As to the paternal great-grandparents’ cross-appeal, the juvenile court’s judgment is hereby affirmed.
2050092 — APPEAL DISMISSED.
*876 2050093 — AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.
CRAWLEY, P.J., and PITTMAN and BRYAN, JJ., concur.
THOMPSON, J., concurs in the result, without writing.

. Rome is approximately 40 miles from Jamestown.

. Although the circuit court’s conclusion that it did not have jurisdiction to entertain the issues of child custody, child support, and visitation arguably was erroneous, see, e.g., Ex parte Jones, 896 So.2d 553 (Ala.Civ.App.2004), no party objected to the severance and transfer. Likewise, no party questioned below and no party questions on appeal whether the juvenile court had subject-matter jurisdiction in the present case. We note that the juvenile court has jurisdiction over paternity actions. See Ala.Code 1975, § 26-17-10(a); see also Ala.Code 1975, § 12-15-31(2). It also has jurisdiction over certain custody-related issues in conjunction with paternity actions. See Ala.Code 1975, § 26-17-14(d) (the juvenile court's order in a paternity action "may contain any other provision ... concerning the duty of support [and] the custody of the child"); see also Ala.Code 1975, § 12-15-30(b)(1).

. The Department of Human Resources, which was not a party to the juvenile-court proceedings, completed a home study on the mother. A home-study report is not contained in the record on appeal, however. The record reflects that the mother completed a series of Child Advocacy Center classes that were intended to assist divorced parents "to understand how important it is to keep their kids out of the middle after a divorce.” Also, the mother registered with the "color-code program,” but she subsequently became pregnant and stopped participating in the program when her physician placed her on bed rest. The record does not reflect whether the father participated in any of the court-ordered programs.

. The record does not reflect why the presiding judge reassigned the divorce action, and no party objected to the reassignment. See Ala.Code 1975, § 12-17-24.2(c) (authorizing a presiding circuit court judge to reassign a case to another circuit court or district court judge of the circuit when the family-court-division docket is overcrowded); Rule 13, Ala. R. Jud. Admin, (authorizing a presiding judge to "temporarily assign circuit or district court judges to serve within the circuit or in district courts within the circuit”).

. The amended order specifically reserved the issue of child support. In July 2006, this court remanded the present case to the juvenile court for it to enter a final judgment addressing the issue of child support. That order has been entered and forwarded to this court in compliance with our direction on remand.

. The paternal great-grandparents raise additional issues in their appellate brief. They contend that tire circuit court's order awarding the father pendente lite custody of the child in June 2004 and its order transferring the paternity and custody issues to the juvenile court were valid and were not an abuse of discretion. No party has alleged that either of the foregoing orders was erroneous, and we find no jurisdictional defect as to the juvenile court's hearing of this case. See note 2, supra. Thus, we will not address these "issues.”

. The mother also challenges the juvenile court’s six-month custody-transfer schedule. However, because the juvenile court did not stay the custody transfer pending appeal, and because the six-month transfer period has already passed, this issue is moot and we will not address it.

. The record contains filings and case-action-summary sheets from both the divorce action and the juvenile-court action. Several pleadings, motions, and orders were captioned for both the divorce action and the juvenile-court action, though we have only discussed the pertinent filings. It appears as if the court clerk was confused as to where to file some of the pleadings, motions, and orders because some of the filings appear in only one action when they were purportedly filed in both actions, and some appear in both actions, though they clearly relate only to the issues that were before the juvenile court.

.Only the juvenile court had rendered a judgment as of the date that the paternal great-grandparents filed their notice of appeal. See Rule 58(a), Ala. R. Civ. P. To conclude otherwise would require us to ignore the fact that the October 2005 judgment purports, on its face, to be the action of the juvenile court (not the circuit court) and, more importantly, that it purports to address issues that were only before the juvenile court. The circuit court clerk's action in "entering” the juvenile court's judgment in the divorce action did not result in the entry of a judgment rendered by the circuit court in the divorce action. See Rule 58(c), Ala. R. Civ. P.
We note, however, that if the paternal great-grandparents' appeal was not in fact from the juvenile court's judgment, it would be due to be dismissed because the circuit court has not entered a judgment addressing the claims that remained before it, i.e., the father’s and mother's divorce and the division of marital property. Because the circuit court has not entered a judgment addressing all claims that remained pending before it, any appeal in the divorce action would be premature. See Rule 54(b), Ala. R. Civ. P.; Hinson v. Hinson, 745 So.2d 280 (Ala.Civ.App.1999).

. Based on our treatment of the paternal great-grandparents' appeal as a cross-appeal in the juvenile-court action, the purported appeal in the divorce action is hereby dismissed.

. The mother gave birth to a son in March 2005. The son was not the biological child of the father in the present case. Although the son’s father did not reside with the mother, the son's father did financially support the mother and the son.

. We have been directed to no common-law authority pursuant to which the trial court could have awarded visitation to the paternal great-grandparents. The paternal great-grandparents argue that because the child was a dependent child the juvenile court had the discretion to award them visitation under the Alabama Juvenile Justice Act, Ala.Code 1975, § 12-15-1 et seq. The juvenile court specifically concluded that the child was not a dependent child, and, as we have stated, that conclusion is supported by the evidence.