MOORE, Judge.
In case no. 2071162, K.W.N. (“the mother”) appeals from a judgment entered by the Cullman Juvenile Court awarding custody of her minor child, C.T., to H.G.T., the father of C.T. We affirm.
In case no. 2071168, the mother appeals from a judgment entered by the Cullman Juvenile Court awarding custody of another one of her minor children, K.M., to S.A.M., the father of K.M. We dismiss the appeal as being from a void judgment.
Facts and Procedural History[1]
On February 21, 2000, the mother and H.G.T., who were not married to one another, had a child, C.T. C.T. was the mother’s second child.[2] On January 31, 2001, the Cullman Juvenile Court adjudicated H.G.T. to be the father of C.T. H.G.T. was awarded visitation and ordered to pay child support. On May 20, 2002, the mother filed a motion requesting that the juvenile court order H.G.T.’s visitation to be supervised and/or terminated, and, on May 24, 2002, the juvenile court entered an order requiring that, pending further order, H.G.T.’s visitation be supervised. On September 13, 2002, H.G.T. filed a motion to rescind the supervised-visitation order; the court denied that motion on October 1, 2002.
On July 8, 2003, the mother gave birth to a third child, KM. On April 6, 2005, the Shelby Circuit Court adjudicated S.A.M. to be the father of K.M. The mother was awarded primary physical custody of K.M., and S.A.M. was awarded visitation and ordered to pay child support.[3]
According to H.G.T., in August 2005, he asked the mother and K.D.S., the maternal grandmother of M.E. (the mother’s first child, see note 2, supra), C.T., and K.M. (“the grandmother”), to take C.T. to the dentist and the mother and the grandmother told him that they would take him in April. In the beginning of 2006, according to H.G.T., the mother began denying him visitation with C.T. On March 22, 2006, H.G.T. filed in the Shelby Juvenile Court a petition seeking a rule nisi and the removal of his visitation restrictions. H.G.T. subsequently modified that petition, requesting that he be awarded custody of C.T. and that the mother be ordered to pay child support. The Shelby Juvenile Court subsequently transferred those proceedings to the Cullman Juvenile Court; those proceedings were assigned case nos. CS-00-56.01, CS-00-56.02, and CS-00-56.03.
Also in March 2006, the mother met W.N.; she married him in April 2006. Shortly thereafter, W.N. and the mother made plans to move to Colorado. On June 15, 2006, the grandmother filed petitions in the Cullman Juvenile Court alleging that M.E., C.T., and KM. were dependent and *440 requesting that the court award her emergency custody of the children. That same day, the juvenile court awarded the grandmother pendente lite custody of the children. The mother testified that the grandmother had told her that if she would move back to Alabama, she would dismiss her dependency petitions.
On March 8, 2007, S.A.M. filed a petition in the Shelby Circuit Court requesting custody of K.M. He also requested that his petition be transferred to the Cullman Juvenile Court. The Shelby Circuit Court transferred the case to the Cullman Juvenile Court on July 13, 2007; the case was assigned case no. CS-07-138. On August 29, 2007, S.A.M. filed a dependency petition in the Cullman Juvenile Court seeking custody of K.M.; that case was assigned case no. JU-07-299.02. The next day, the grandmother filed another dependency petition in the Cullman Juvenile Court (hereinafter referred to as “the juvenile court”) seeking custody of K.M.; that petition was assigned case number JU-06-299.03.[4] All four of the grandmother’s dependency petitions were dismissed; however, H.G.T., K.M., and J.E. (the mother’s former husband and M.E.’s father, see note 2, supra) requested that the dismissals be set aside for the limited purpose of allowing them to seek sanctions against the grandmother in those cases. The record does not indicate whether the dismissals were ever set aside.
In November 2007, the mother gave birth to her fourth child, whose father is W.N. After a hearing, at which the mother and the grandmother failed to appear, the juvenile court entered orders on November 16, 2007, awarding custody of C.T. to H.G.T. and awarding custody of K.M. to S.A.M.; the orders authorized law enforcement to assist H.G.T. and S.A.M. in effectuating the orders.[5] Thereafter, H.G.T. and S.A.M., along with J.E., traveled with law enforcement to Nebraska to pick up the children. H.G.T. and S.A.M. telephoned the mother and informed her that they had been awarded custody of C.T. and K.M., respectively. Ultimately, the fathers met the mother at a park. It is undisputed that the mother and W.N. arrived with Nebraska police officers and a cameraman from a local television station. H.G.T. testified that W.N. was also videotaping the events. The fathers were not allowed to take the children or to visit with them. In December 2007, H.G.T. and S.A.M., along with J.E., again went to Nebraska to retrieve their respective children. J.E. testified that, when they arrived at the mother’s house, the grandmother was there with three pick-up trucks, a U-Haul truck, and packed boxes.
On December 26, 2007, the mother filed a notice of appeal from the November 16, 2007, orders; this court dismissed the appeal as being from nonfinal judgments. On February 19, 2008, the juvenile court, upon the mother’s motion, vacated the November 16, 2007, orders. The juvenile court held final hearings on H.G.T.’s and S.A.M.’s petitions to modify custody on March 12, March 13, and June 10, 2008.
At trial, H.G.T. testified that most of C.T.’s teeth are decayed and that, after he obtained custody of C.T., he took C.T. to the dentist to have his dental issues addressed. H.G.T. further testified that, at the time he obtained custody of C.T., C.T. *441 was not potty-trained and that, while in the mother’s custody, C.T. had had to go to the emergency room due to impaction of his bowels. S.A.M. testified that, during the time that he and the mother were in a relationship, he had tried to help potty-train C.T. but that the mother had not wanted anything to do with the discipline of C.T. H.G.T. testified at the final day of the trial that, since C.T. had been in his custody, he had been completely potty-trained. H.G.T. testified that the mother and the grandmother had allowed C.T. to race a motorcycle and that he had wrecked and cut his leg. The mother and the grandmother testified that the motorcycle H.G.T. referred to was actually a “pit bike” and that it was “governed down.”
The mother admitted that, in the 8 years of C.T.’s life, she had moved approximately 8 times and had had approximately 11 different jobs. The mother testified at trial that she was not presently employed, that her grandfather was supporting her financially, and that she was living in Huntsville in a four-bedroom house.
H.G.T. testified that the mother had denied him visitation with C.T. multiple times. He testified that the mother had told him that he did not have any parental rights unless she said he did. The mother testified that the grandmother had tried to control the mother’s children’s visitation with their fathers. S.A.M. testified that the mother had told him that, because the grandmother paid for the mother’s cars and house, the mother could not control the grandmother. H.G.T. testified that on most of his visits with C.T. he had picked up C.T. from, and returned him to, the grandmother. The mother testified that the children had lived with the grandmother during the week each summer. H.G.T. testified that he had not known about that arrangement. The grandmother testified that a sex offender had lived on her property in the past but that, at the time of the trial, he was living across the road from her property. The grandmother testified that the sex offender comes over to her house and that children may see the sex offender but that they have no physical contact with him. The mother testified that she would not let the grandmother control her anymore; however, the mother testified that she had exercised visitation at the grandmother’s house between the March and June 2008 hearings.
The mother admitted that she and W.N. had been involved in incidents of domestic violence. The mother’s oldest child, M.E., testified that she had been present during one of those incidents. The mother testified at trial that she and W.N. were physically separated but that they were not legally separated. The mother also admitted that she had allowed the children’s insurance to lapse at times.
H.G.T. testified at trial that he had lived in his mother’s house in Vestavia for the past 10 years. He testified that his mother, who had been a missionary in Bolivia, was moving back to her house in Vestavia the weekend after the March hearing and that, because of that, he had purchased a 2,020-square-foot, 4-bedroom, 3-bath, new house in Vestavia. He testified that the house is 1/4 of a mile from the school that C.T. would attend. H.G.T. testified that the Vestavia school district is the 13th best school district in Alabama. H.G.T. testified that he has a daughter, who is younger than C.T. and lives with her mother, and that she and C.T. love each other.
H.G.T. testified that he had been consistently employed in the banking industry for the past 13 years and that his annual gross income is $80,150. H.G.T. testified that he can provide stability for C.T. He testified that he makes C.T. eat right, brush his teeth, do chores, and do his homework, and that he does not allow C.T. to drink sodas. H.G.T. testified that C.T. *442 makes good grades. H.G.T. also testified that, since C.T. had been in his custody, he, J.E., and S.A.M. had worked together to allow C.T., K.M., and M.E. to see each other. He testified that J.E. and M.E. had spent the night at his home. J.E. testified that H.G.T.’s house is very clean. H.G.T. further testified that, since C.T. had been in his custody, he had allowed the mother to have more visitation than had been required by the temporary order.
The mother testified that H.G.T. had come to only one of C.T.’s baseball games and that he had not visited with C.T. consistently until C.T. was about one and a half years old. She also testified that H.G.T. had made false allegations to the Department of Human Resources concerning her treatment of C.T.
After the trial, the juvenile court entered a judgment in case nos. CS-00-56.01, CS-00-56.02, and CS-00-56.03 finding that a material change in circumstances had occurred and awarding primary custody of C.T. to H.G.T.; in CS-07-138, the juvenile court entered a judgment finding that a material change in circumstances had occurred, awarding custody of K.M. to S.A.M., and denying all further relief requested. The mother filed a timely postjudgment motion in each case; those motions were denied. The mother timely filed her notices of appeal with this court.

Discussion

I. Case No. 2071163

Although neither party challenges the jurisdiction of the juvenile court to determine custody regarding K.M., “[jjurisdictional matters are of such importance that a court may take notice of them ex mero motu.” McMurphy v. East Bay Clothiers, 892 So.2d 395, 397 (Ala.Civ.App.2004).
“Juvenile courts are purely creatures of statute and have extremely limited jurisdiction.” T.B. v. T.H., 30 So.3d 429, 431 (Ala.Civ.App.2009). “A juvenile court has jurisdiction in proceedings involving a child who is alleged to be dependent, § 12-15-30(a), Ala.Code 1975, and in custody proceedings when the child is ‘otherwise before the court.’ § 12—15—30(b)(1), Ala. Code 1975.” K.S. v. H.S., 18 So.3d 417, 418 (Ala.Civ.App.2009). Although dependency petitions with “JU” case designations had been filed concerning K.M., the juvenile court did not modify custody of K.M. in the context of those proceedings; instead, it modified custody of K.M. in the context of a custody-modification proceeding in case no. CS-07-138. See, e.g., T.B., 30 So.3d at 432. The juvenile court’s order indicated that it found a material change in circumstances, language consistent with the standard to be applied to a regular custody-modification case, not a dependency case.
Furthermore, K.M. was not “otherwise before the court,” because the judgment adjudicating KM.’s paternity and making the initial custody determination as to K.M. was not entered by a juvenile court.[6] Having found no basis for the juvenile court to exercise jurisdiction over S.A.M.’s custody-modification petition, we must conclude that the juvenile court’s judgment awarding primary physical custody of K.M. to S.A.M. is void. ‘“[A] judgment entered without subject-matter jurisdiction is void, ... and ... a void judgment will not support an appeal.’ ” T.B., 30 So.3d at 433 (quoting K.R. v. D.H., 988 So.2d 1050, 1052 (Ala.Civ.App.2008)). Thus, we must dismiss the appeal. T.B., 30 So.3d at 433.

*443
II. Case No. 2071162

In case no. 2071162, the mother first challenges the June 15, 2006, order awarding temporary custody of C.T. to the grandmother. We note, however, that that order was not a final order and that the juvenile court ultimately awarded custody of C.T. to H.G.T. pursuant to the custody-modification proceeding instituted by H.G.T. Accordingly, the propriety of the temporary-custody order is moot. See, e.g., L.R.M. v. D.M., 962 So.2d 864, 872 n. 7 (Ala.Civ.App.2007).
The mother next challenges the juvenile court’s judgment awarding custody to H.G.T. Before addressing the merits of the mother’s argument, we address whether the juvenile court had jurisdiction to modify custody of C.T. In W.B.G.M. v. P.S.T., 999 So.2d 971 (Ala.Civ.App.2008), this court stated:
“When a juvenile court has jurisdiction to make an initial child-custody determination, it retains jurisdiction over a petition to modify that custody judgment to the exclusion of any other state court until the child reaches 21 years of age or the juvenile court terminates its jurisdiction. See Ala.Code 1975, § 12-15-82. Moreover, once a juvenile court enters a custody judgment in a paternity action under the Alabama Uniform Parentage Act, that court ‘retain[s] jurisdiction of the cause for the purpose of entering such other and further orders as changing circumstances of the parties may in justice and equity require.’ Ala.Code 1975, § 26-17-10(e); see generally State ex rel. B.G. v. J.F.P., 721 So.2d 213, 217-18 (Ala.Civ.App.1998)....
“In the present case, § 12-15-31(2), Ala.Code 1975, conferred exclusive jurisdiction on the juvenile court to decide the issue of paternity. Once the children were before the court on the paternity issue, § 12—15—30(b)(2) gave the juvenile court exclusive original jurisdiction to decide the issue of who should be awarded custody of the children, and the juvenile court exercised that jurisdiction by awarding custody of the children to the mother. Based on § 12-15-32 and § 26-17-10(e), the juvenile court retained jurisdiction to consider any petition to modify its custody judgment unless it terminated that jurisdiction by its own order. Because there is no evidence indicating that the juvenile court terminated its jurisdiction, it is the only court in this state with jurisdiction to modify its custody judgment.”
999 So.2d at 974-75.
Similarly, in the present case, the juvenile court had previously exercised its exclusive jurisdiction to decide the issue of C.T.’s paternity. Once C.T. was before the court on that issue, § 12-15-30(b)(2) gave the juvenile court exclusive original jurisdiction to decide the issue of C.T.’s custody, and the juvenile court exercised that jurisdiction by awarding the mother custody of C.T. Pursuant to § 12-15-32 and § 26-17-10(e), the juvenile court retained jurisdiction to consider H.G.T.’s petition to modify its custody judgment unless it terminated that jurisdiction by its own order. There is nothing in the record indicating that the juvenile court terminated its jurisdiction; thus, the juvenile court had jurisdiction to modify its initial custody judgment.
Having determined that the juvenile court had jurisdiction to modify the custody of C.T., we now address the merits of the mother’s challenge to the juvenile court’s custody-modification judgment. First, the mother argues that the juvenile court exceeded its discretion in determining that H.G.T. had met the standard set out in Ex parte McLendon, 455 So.2d 863 (Ala.1984).
“A parent seeking to modify a custody judgment awarding primary physical *444 custody to the other parent must meet the standard for modification of custody set forth in Ex parte McLendon[, 455 So.2d 863 (Ala.1984) ]. Under that standard, the parent seeking to modify custody of a child must demonstrate that there has been a material change in circumstances, that the proposed change in custody will materially promote the child’s best interests, and that the benefits of the change will more than offset the inherently disruptive effect caused by uprooting the child. Ex parte McLendon, supra.”
Adams v. Adams, 21 So.3d 1247, 1252 (Ala.Civ.App.2009).
In the present case, the evidence indicated, among other things, that, since the initial determination of custody, the mother had lived a highly unstable lifestyle, had denied H.G.T. visitation with C.T., had neglected C.T.’s dental health, and had failed to potty-train C.T. Also, H.G.T. testified that the mother had allowed C.T. to race a motorcycle and that C.T. had been injured as a result. The evidence also indicated that there had been incidents of domestic violence between the mother and her current husband, including one incident that had occurred in M.E.’s presence. Further, the mother had allowed the grandmother to exert control over her and the children, to the detriment of H.G.T.’s ability to exercise visitation with C.T. Based on the foregoing, we conclude that there is sufficient evidence from which the trial court could have determined that there had been a material change in circumstances since the initial custody order.
We next address whether “the proposed change in custody will materially promote the child’s best interests, and [whether] the benefits of the change will more than offset the inherently disruptive effect caused by uprooting the child.” Adams, 21 So.3d at 1252. H.G.T. testified that he had lived in the same home for the past 10 years and that he had been consistently employed in the banking industry. He had recently purchased a house with sufficient room for C.T. to live with him. H.G.T. testified that he had provided stability for C.T., ensuring that C.T.’s dental needs were met and having potty-trained C.T. by the final day of the trial. Further, H.G.T. testified that his new home was in a good school district, that he ensured that C.T. did his homework, and that C.T. had been making good grades. Finally, H.G.T. testified that he had allowed the mother more visitation than was required under the temporary order and that he had been able to work with the fathers of C.T.’s half-siblings so that the siblings could see one another. Based on the foregoing, we conclude that the change in custody would materially promote C.T.’s best interest. Furthermore, especially considering that the mother had moved eight times since C.T. was born, we conclude that “the benefits of the change will more than offset the inherently disruptive effect caused by uprooting [C.T.].” Adams, 21 So.3d at 1252.
The mother also briefly argues that there was evidence indicating that H.G.T. had committed domestic violence. We note, however, that the record reveals no such “evidence.” Further, the record contains substantial evidence indicating that the mother and her current husband have a relationship filled with domestic violence. Accordingly, we find the mother’s argument on the domestic-violence issue unpersuasive.

Conclusion

Based on the foregoing, we affirm the judgment in case no. 2071162. We dismiss the appeal in case no. 2071163 as being from a void judgment, albeit with instructions to the juvenile court to set aside its void judgment. See T.B., supra.
*445 2071162 — AFFIRMED.
2071163 — APPEAL DISMISSED WITH INSTRUCTIONS.
THOMPSON, P.J., and PITTMAN and BRYAN, JJ., concur.
THOMAS, J., recuses herself.

. Because we are dismissing the appeal concerning the determination of custody of K.M., we focus on the facts as they relate to the determination of custody of C.T.

.The mother’s first child, M.E., was born to the mother and her former husband, J.E., on July 10, 1995. The mother had custody of M.E. pursuant to a judgment divorcing her and J.E. M.E.’s custody is not the subject of this appeal.

.The judgment adjudicating K.M.'s paternity and making the initial custody determination as to K.M. was entered by the Shelby Circuit Court. Although we recognize that " § 12-15-31(2), Ala.Code 1975, confers exclusive jurisdiction on the juvenile court to decide the issue of paternity,” W.B.G.M. v. P.S.T., 999 So.2d 971, 975 (Ala.Civ.App.2008), that judgment is not at issue in this appeal. Thus, we make no determination on the validity of that judgment.

. Because the juvenile court awarded custody of K.M. in the. context of case no. CS-07-138, and not the dependency proceedings, the record does not indicate the ultimate disposition of the dependency proceedings. There is nothing in the record to indicate that the dependency proceedings regarding K.M. were consolidated with the "CS” custody-modification case regarding K.M.

. The juvenile court also entered an order awarding custody of M.E. to J.E.

. See note 3, supra.