Baron Services, Inc., an Alabama corporation ("Baron Services"), petitioned this Court for a writ of certiorari to review whether the Court of Civil Appeals erred in reversing the trial court's judgment with respect to the fair value of Baron Services stock held by James Offenbecher. See Offenbecher v. Baron Services, Inc., [Ms. 2000025, May 10, 2002] 874 So.2d 532 (Ala.Civ.App. 2002). This Court granted certiorari review on September 13, 2002. For the reasons discussed below, we affirm the judgment of the Court of Civil Appeals.
 I.
Baron Services, located in Huntsville, develops weather-radar software that assists local television stations in monitoring storms and in predicting the timing, severity, *Page 547 
and location of storms. Robert Baron founded Baron Services in 1990 and retains a controlling interest in the stock of the company. He currently serves as the company's president and chief executive officer.
On March 31, 1998, the board of directors of Baron Services approved a plan of merger pursuant to which Baron Services was to merge into Baron Services, Inc., a Delaware corporation ("Baron-Delaware"). The proposed merger was structured as a stock-for-stock exchange, that is, a shareholder in Baron Services would receive one share of Baron-Delaware stock for each share of Baron Services stock he or she owned. The merger plan also contained a cash-out provision applicable to any shareholder who owned fewer than 150 shares of Baron Services stock; it provided that any such shareholder would receive the cash value of his or her shares instead of stock in the surviving corporation. Offenbecher owned 130 shares of Baron Services stock, which he received in exchange for services he had provided to the company; therefore, under the terms of the proposed merger, Offenbecher's shares were to be cashed out.
In conjunction with the merger, Baron Services engaged Gary Saliba of Saliba Financial Economics Group, Inc., to value the company's stock.[1]
Saliba estimated that, as of December 31, 1997, "the fair value of a shareholder's interest in Baron Services, Inc.," was $1,124.94 per share. Saliba estimated the "marketable value of the Company's equity" at $562.47 per share, after applying a 50% marketability discount. Saliba subsequently adjusted this estimate to $547.77 per share upon receiving a lower sales forecast from Baron Services.
To arrive at those figures, Saliba calculated the weighted-average value of Baron Services' equity under two recognized methods of valuation — discounting future earnings and capitalizing actual earnings. Discounting and capitalizing earnings are direct-valuation approaches, that is, they rely on data specific to the subject company. Discounting is a valuation approach in which a discount rate is applied against a stream of projected future earnings. The discount rate represents the rate of return an investor in the company would expect to receive over a long period. Capitalizing earnings involves applying a capitalization rate, which is derived from the discount rate, to past years' earnings.[2]
A majority of the shareholders at a shareholders' meeting on April 17, 1998, adopted the plan of merger approved by the board of directors on March 31, 1998. Exercising his rights under § 10-2B-13.02(a), Ala. Code 1975, Offenbecher dissented from the plan of merger and demanded payment for his shares, specifically *Page 548 
rejecting the price at which his shares were to be purchased pursuant to the plan of merger. On August 11, 1998, Baron Services petitioned the trial court, pursuant to §10-2B-13.30, Ala. Code 1975, to appraise the fair value of its stock.[3]
The action proceeded to trial on February 7, 2000. The proceedings included oral testimony from financial experts for each of the parties. On April 13, 2000, the trial court entered an order, finding that the amount Baron Services had offered Offenbecher for his shares represented the fair value of those shares. That order read, in part:
 "The Court finds from the evidence that Mr. Saliba's appraisal, more fairly and reasonably than the appraisal performed for Mr. Offenbecher by Mr. `Butch' Williams [Offenbecher's financial expert], reflects the fair value of Mr. Offenbecher's stock . . . .
 "The Court also finds as a matter of financial analysis that Mr. Saliba's decision to apply a marketability discount `at the corporate level' was reasonable and necessary to the determination of the `fair value' of Baron Services' stock. The Court also concludes that a marketability discount was appropriate as a matter of law."
On May 15, 2000, Offenbecher moved the trial court to alter, amend, or vacate the judgment.[4] The trial court denied the motion on July 17, 2000, after hearing oral arguments. Offenbecher filed a notice of appeal in the Court of Civil Appeals on August 25, 2000. On May 18, 2001, the Court of Civil Appeals affirmed the judgment of the trial court. On June 1, 2001, Offenbecher applied for a rehearing, which the Court of Civil Appeals granted. On May 10, 2002, the Court of Civil Appeals withdrew its May 18, 2001, opinion and issued another opinion, affirming the judgment of the trial court in part and reversing the trial court's judgment insofar as it applied a 50% marketability discount when valuing Baron Services stock. Offenbecher, 874 So.2d at 539.
 II.
The sole issue we address on appeal is the meaning of "fair value" under § 10-2B-13.01, Ala. Code 1975, and whether the meaning of that term provides for the application of a marketability discount in the context of a judicial appraisal of a dissenting shareholder's shares. This question is one of first impression in this Court; it is for this reason that we granted Baron Services' petition for certiorari review.See Rule 39(a)(1)(C), Ala.R.App.P.
 Standard of Review
The trial court entered its judgment in this case after hearing oral testimony from the parties regarding the fair value of Baron Services stock. Therefore, the ore tenus rule applies to our review of the trial court's findings of fact. "Under the ore tenus rule, a trial court's findings of fact are presumed correct and its judgment will be reversed only if plainly or palpably wrong or against the preponderance of the evidence." Ex parte Cater,772 So.2d 1117, 1119 (Ala. 2000). The appraisal of the fair value of a dissenting shareholder's stock is a question of fact. Huntsville Indus.Assocs., Inc. v. Cummings, 292 Ala. 391, 398, 295 So.2d 251, 256 (1974).
The trial court's interpretation of § 10-2B-13.01, Ala. Code 1975, involves a *Page 549 
question of law; it is, therefore, not subject to the ore tenus standard of review. "[T]he ore tenus rule does not extend to cloak a trial judge's conclusions of law . . . with a presumption of correctness." Eubanks v. Hale, 752 So.2d 1113, 1144-45 (Ala. 1999). Therefore, we review de novo, without any presumption of correctness, the trial court's conclusions as to the permissibility of applying a marketability discount to appraise "fair value" under § 10-2B-13.01, Ala. Code 1975.
 The Meaning of Fair Value
"Fair value," with respect to a dissenter's shares, is defined at § 10-2B-13.01(4), Ala. Code 1975, as follows:
 "`Fair Value,' with respect to a dissenter's shares, means the value of the shares immediately before the effectuation of the corporate action to which the dissenter objects, excluding any appreciation or depreciation in anticipation of the corporate action unless exclusion would be inequitable."
The statute is silent on the application of a marketability discount.[5]
Therefore, we are forced to look outside the language of the statute to determine what the Legislature intended.
Baron Services urges this Court to adopt a definition of fair value that would permit the application of marketability discounts in the case of shares of a closely held corporation. A marketability discount adjusts for a lack of liquidity in one's shares on the theory that there is a limited supply of potential buyers for stock in a closely held corporation. Thus, the interpretation of fair value advanced by Baron Services takes into account the limited market available for sale of the shares.
Under its interpretation of fair value, Baron Services essentially equates fair value with fair market value.
 "Under a fair market value standard a marketability discount should be applied because the court is, by definition, determining the price at which a specific allotment of shares would change hands between a willing buyer and a willing seller."
Pueblo Bancorporation v. Lindoe, Inc., [Ms. 01SC645, January 21, 2003] 63 P.3d 353, 361 (Col. 2003).
There is, however, a fundamental difference between fair value and fair market value when those terms are used in the appraisal context:
 "`Fair value' is not the same as, or short-hand for, `fair market value.' `Fair value' carries with it the statutory purpose that shareholders be fairly compensated, which may or may not equate with the market's judgment about the stock's value. This is particularly appropriate in the close corporation setting where there is no ready market for the shares and consequently no fair market value. *Page 550 
 ". . . When appraising shares of a close corporation, fair value cannot be fairly equated with the company's fair market value. Close corporations by their nature have less value to outsiders, but at the same time their value may be even greater to other shareholders who want to keep the business in the form of a close corporation. [Marketability] [d]iscounts would call for speculation by a court as to whether a market exists by requiring the judge to determine a value, deduct a variable percentage, decide how unmarketable a stock is, and so forth . . . . Furthermore, applying a lack of marketability discount would allow the majority who approved the transaction to later buy out with a net gain what the minority dissenters have lost, granting the majority an unfair windfall."
Bobbie J. Hollis II, The Unfairness of Applying Lack of MarketabilityDiscounts to Determine Fair Value in Dissenters' Rights Cases, 25 J. Corp. L. 137, 141-42 (1999) (footnotes omitted).
We have recognized fair market value as "`"the sum arrived at by fair negotiation between an owner willing to sell and a purchaser willing to buy, neither being under pressure to do so."'" Mt. Carmel Estates, Inc.v. Regions Bank, [Ms. 1011357, Dec. 13, 2002] 853 So.2d 160, 166 (Ala. 2002) (quoting Barnard v. First Nat'l Bank of Okaloosa County,482 So.2d 534, 536 (Fla.Dist.Ct.App. 1986), quoting in turn Flagship Bankof Orlando v. Bryan, 384 So.2d 1323 (Fla.Dist.Ct.App. 1980)).[6] In the context of a cash-out merger, a minority shareholder is not a willing seller; instead, the minority shareholder is selling his or her shares under the compulsion of the majority shareholders who approved the merger. We cannot conclude that the Legislature intended by fair value to mean fair market value.
The Delaware courts define the fair value of a dissenting shareholder's shares as the value of "what has been taken from the shareholder: `viz. his proportionate interest in [the company as] a going concern.'"Cavalier Oil Corp. v. Harnett, 564 A.2d 1137, 1144 (Del. 1989) (quotingTri-Continental Corp. v. Battye, 74 A.2d 71, 72 (Del. 1950)).[7] In determining the dissenting shareholder's proportionate interest, "the [trial court] is not required to apply further weighting factors at the shareholder level, such as discounts to minority shares for asserted lack of marketability." 564 A.2d at 1144. In reaching this conclusion, the Delaware court reasoned:
 "The application of a discount to a minority shareholder is contrary to the requirement that the company be viewed as a `going concern.' . . . Where there is no objective market data available, the appraisal process is not intended to construct a pro forma sale but to assume that the shareholder was willing to maintain his investment position, however slight, had the merger not occurred. Discounting individual share holdings injects into the appraisal process speculation on the various factors which may dictate the marketability of minority shareholdings. More important, to fail to accord to a minority *Page 551 
shareholder the full proportionate value of his shares imposes a penalty for lack of control, and unfairly enriches the majority shareholders who may reap a windfall from the appraisal process by cashing out a dissenting shareholder, a clearly undesirable result."
Id. at 1145. We hereby adopt the Delaware fair-value standard insofar as it prohibits discounting for lack of marketability, or otherwise, at the shareholder level.[8]
Baron Services argues that Saliba in fact applied the marketability discount in this case at the company level, not at the shareholder level, and that, therefore, the discount was permissible under the fair-value standard. See Onti, Inc. v. Integra Bank, 751 A.2d 904, 912
(Del.Ch. 1999) (applying discount to market value of shares because shareholders were restricted in their ability to sell shares under Securities and Exchange Commission Rule 144). In Onti, the court calculated the value of the subject company, and, in turn, the fair value of the dissenting shareholder's shares, by weighing the values of the company using a stock-market-value approach and a discounted-cash-flow approach. In determining the value of the company under the stock-market-value approach, the court applied a 31.31% discount to the market value of the successor company's publicly traded stock. This discount reflected the fact that the stock the dissenting shareholders would have received in the successor company but for the cash-out merger would have been unregistered stock.[9] However, the discounted-cash-flow value assigned to the business did not reflect a further marketability discount to take into account the fact that the shares could not be freely traded.
Saliba's valuation, unlike the court's valuation in Onti, was not calculated, in whole or in part, on the stock-market value of a publicly traded company. Further, it was not calculated based on a comparative market analysis, which, by its nature, requires that a marketability discount be applied to the figures of the company being used for comparison. The direct-valuation approaches used in Saliba's valuation are not based on market-comparable values; therefore, we find no reason to apply a marketability discount in this case.
Nonetheless, Baron Services argues, the marketability discount was necessary to account for the cost of capital differences between it and public companies. In this regard, Saliba testified:
 "If I had not made that [marketability] adjustment, I would have raised my cost of capital numbers and I would have increased the public offering discount and I would have included a liquidity premium for that shareholder . . . ."
In deriving appropriate discount and capitalization rates for use in his valuation models, Saliba did account for the fact that Baron Services was a small closely held company that presented a higher degree of investment risk than a larger publicly traded company. Saliba included in the *Page 552 
discount rate a "micro-capitalization risk premium" of 3.5% and a "company size premium" of 4.35%. He describes his rationale for adding those premiums as follows:
"3. Micro-Capitalization Risk Premium
 "The typical small company has a higher degree of investment risk than a similar, but larger company. . . . Therefore, smaller companies must offer a higher expected rate of return than similar larger companies. . . .
". . . .
"5. Equity Risk related to Size Differential
 ". . . Since a small, closely-held company is usually restricted to narrower markets than publicly-traded companies, an additional small company premium is warranted. . . ."
By including the above premiums in the discount rate, Saliba directly accounted for the market differences between Baron Services and larger public companies. Based on the justifications given by Saliba for including in his valuation the "micro-capitalization risk premium" and the "company size premium," permitting a marketability discount would amount to double counting the market premiums included in the discount rate.
The need for a "public-offering discount" is not apparent from the facts of this case. In his valuation report, Saliba states: "Given the size of the Subject Company, its corporate organization and the number of shareholders, the likelihood of a public offering is considered implausible." Moreover, "a liquidity premium for [Offenbecher]" would not be permissible under the fair-value standard because it would apply to Offenbecher's shares only. See Cavalier Oil, 564 A.2d at 1144. Therefore, we are not convinced by Baron Services' argument that "as a matter of financial analysis" a marketability discount was reasonable and necessary in this case.
 III.
Based on our interpretation of the meaning of fair value under §10-2B-13.01(4), Ala. Code 1975, we conclude that the marketability discount applied in this case was improper, and we affirm the judgment of the Court of Civil Appeals.
AFFIRMED.
MOORE, C.J., and BROWN, HARWOOD, and STUART, JJ., concur.
[1] Saliba's valuation report, dated December 31, 1997, states the purpose of the valuation as follows:
 "Saliba Financial Economics Group was retained to render an opinion as to the fair market value of certain common shares in Baron Services, Inc. The purpose of the valuation was to assist the Company's Board of Directors in determining the fair market value, at the Shareholder level, regarding an ownership position in the Company's common stock."
[2] Notably, Saliba did not use a public-market comparison to value Baron Services. Under this method, one looks for a similar actively traded company to estimate the value of the subject company. If the subject company is privately held, that is, not publicly traded, a marketability discount would be applied; that discount would account for the fact that the comparison is to a public company instead of a private company. In his report in this case, Saliba noted that he could not identify any comparable companies that were publicly traded, so he did not use public-market comparison as a valuation technique.
[3] At the start of the appraisal proceeding in the trial court, Baron Services and Offenbecher stipulated that the statutory requirements for appraisal had been satisfied by each party.
[4] May 13, 2000, the thirtieth day after the order was entered, was a Saturday; therefore, Offenbecher's motion filed on Monday, May 15, 2000, was timely.
[5] The Alabama Business Corporation Act, § 10-2B-1.01 et seq., Ala. Code 1975, is based on the Model Business Corporation Act ("the MBCA"). The MBCA was revised in 1999 to expressly address the issue of marketability discounts. The MBCA, as revised, defines fair value as "the value of the corporation's shares determined . . . without discounting for lack of marketability . . . ." Model Bus. Corp. Act 3d § 13.01(4)(iii) (2002). Although the MBCA had not been revised when the Legislature enacted the Alabama Business Corporation Act, we view the 1999 revision as reflective of the majority view in states that have adopted the MBCA. See Blitch v. Peoples Bank, 246 Ga. App. 453, 456,540 S.E.2d 667, 669-70 (2000) ("[T]he majority of other jurisdictions with [MBCA] statutes have held that . . . marketability discounts should not be applied when determining the fair value of dissenting shareholders' stock. . . . Reflecting this majority view, the [MBCA] definition of fair value was modified in 1999." (footnote omitted)).
[6] Black's Law Dictionary 597 (6th ed. 1990) defines fair market value as:
 "The amount at which property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of the relevant facts."
[7] Offenbecher and Baron Services both agree that Delaware law is instructive in determining the meaning of fair value under Alabama's judicial-appraisal statute. See also Commentary to § 10-2B-13.01
("There is considerable Delaware case law on the subject [of fair value].").
[8] We further note that the standard we adopt here today is consistent with Saliba's definition of fair value in the valuation report:
 "[F]air value represents a proportionate share of the value of the whole, with entity value based on such factors as individual assets values, ongoing concern values, and/or a combination of approaches. A material factor with respect to fair value is that the lack of marketability is not considered, in that the interest would be considered marketable."
(Emphasis added.)
[9] Securities and Exchange Commission Rule 144, 17 C.F.R. § 230.144, imposes restrictions on the alienability of unregistered stock in a public company. Unregistered shares, thus, are less valuable than registered shares, which can be freely traded on the market.