THOMAS, Judge.
 

 On February 28, 2005, Allison Richardson Wright (“the wife”) filed a complaint for divorce from John Duff Wright (“the husband”). On November 19, 2007, the Baldwin Circuit Court divorced the parties on the ground of the husband’s adultery. The court awarded the wife sole physical custody of the parties’ three children; granted the husband visitation rights; ordered the husband to pay $8,000 per month in child support; divided the parties’ marital assets; and ordered the husband to pay the wife $2,000 per month in periodic alimony. The court also awarded the wife an attorney’s fee in the amount of $10,000.
 

 The case was tried on four separate days, beginning on July 30, 2007, and ending on October 29, 2007. The judgment was entered on November 19, 2007; the husband filed a timely postjudgment motion, which was granted in part and denied in part. The husband timely appealed.
 

 Factual Background
 

 The parties were married in 1986. They waited almost 10 years to have children, during which time they concentrated on their careers. The 43-year-old husband, who has a bachelor’s degree in accounting, achieved his goal of becoming a millionaire by the time he was 35 years old. Until 2005, the husband’s income was derived from his investments in the stock market and his salary from Craft Farms in Gulf Shores, where he managed both the trucking line and the turf-grass production. The husband left Craft Farms in 2005. Since then, his income has been derived from his 25% interest in Gulf Coast Office Products, Inc. (“GCOP”),
 
 [1]
 
 and his 50% interest in two real-estate investment firms, 1N3W Investments, LLC, and M & J Investments, LLC.
 

 The 42-year-old wife, who has a bachelor’s degree in nursing and a master’s degree in nursing education, worked in the nursing field until the parties’ first child was born in 1995. After the birth of the first child, the parties agreed that the wife would not work outside the home but would stay at home and care for their children. Along with her complaint for a divorce, the wife filed a Form CS-41 (“Child Support Obligation Income Statement/Affidavit”) indicating that she had no income. At trial, however, the wife testified that she earns approximately $150 per week, or $7,000 per year, for working four to six hours per week as a lactation consultant at Thomas Hospital. The parties have 3 daughters who were, at the time of trial, 12, 7, and 3 years old.
 

 Before their final separation in February 2005, the parties had previously been separated for a 19-month period between
 
 *904
 
 March 2000 and October 2001. The previous separation occurred when the wife was pregnant with the parties’ second child and the husband admitted that he was having an affair with a woman in Atlanta. The husband returned for the birth of the parties’ second child but left four days later. When the parties reconciled a year later, the husband apologized and promised to be faithful in the future, the wife forgave him, and they planned their third child. When the parties separated for the final time in February 2005, their third child was four months old; at that time, the husband admitted to the wife that he had been having an affair for 18 months.
 

 I.
 
 Child Support
 

 The husband argues that the trial court erred by ordering him to pay $3,000 per month in child support because, he says, the court deviated from the child-support guidelines without making a “written finding on the record indicating that the application of the guidelines would be unjust or inappropriate.”
 
 See
 
 Rule 32(A), Ala. R. Jud. Admin.
 
 [2]
 
 The husband’s argument is based on the premise that, using his 2006 annual income— which, he says, was $83,592, the parties’ combined monthly gross income for 2006 was $10,000 or less, thereby allowing for a scheduled child-support payment of no more than $1,934 for three children. The husband did not submit a Form CS-41 indicating his income, but he offered a document admitted as husband’s Exhibit 19A that sets out his five-year income history. Exhibit 19A indicates that in 2006 the husband reported $574,458 on his federal income-tax return; that he paid federal income tax of $149,430; that his “after tax income” was $425,028; that he had $341,436 of income “reported, but not received”; and that his “take home pay” was $83,592.
 

 The husband’s argument is fundamentally flawed because his take-home pay of $83,592 was not his 2006 income for purposes of the child-support guidelines. Under the guidelines, “ ‘income’ means actual gross income of a parent,” Rule 32(B)(1), Ala. R. Jud. Admin., and “ ‘[gjross income’ includes income from any source,” Rule 32(B)(2), Ala. R. Jud. Admin.
 
 See Massey v. Massey,
 
 706 So.2d 1272, 1274 (Ala.Civ.App.1997) (citing
 
 Ex parte St. Clair Dep’t of Human Res.,
 
 612 So.2d 482, 483 (Ala.1993), for the proposition that our supreme court has recognized that “the guidelines require the trial court to consider the resources of the parents, and not simply their incomes, in determining child support”). Further, Rule 32(B)(3)(a) provides:
 

 “For income from ... joint ownership of a partnership or closely held corporation, ‘gross income’ means gross receipts minus ordinary and necessary expenses required to produce such income, as allowed by the Internal Revenue Service, with the exceptions noted in section (B)(3)(b).”
 

 Rule 32(B)(3)(b) provides:
 

 “ ‘Ordinary and necessary expenses’ does not include amounts allowable by the Internal Revenue Service for the accelerated component of depreciation expenses, investment tax credits, or any other business expenses determined by the court to be inappropriate for determining gross income for purposes of calculating child support.”
 

 
 *905
 
 The husband’s actual gross income for 2006 was either $574,458 — the amount labeled on the husband’s Exhibit 19A as “income reported,” which is the amount reported on the parties’ Form 1040, 2006 federal income-tax return as “total income,” or $562,737, the amount reported on the parties’ Form 1040, 2006 federal income-tax return as “adjusted gross income.” For purposes of our analysis, we will use the lesser amount. Regarding the $341,436 that the husband labeled on Exhibit 19A as “income reported but not received” in 2006, the husband testified at trial that he had reported that income “on the K-l Schedule.” “K-l income” refers to a shareholder’s proportionate share of an S corporation’s income, even when the corporation retains the income,
 
 see McHugh v. McHugh,
 
 702 So.2d 639, 641 (Fla.Dist.Ct.App.1997), and a partner’s share of partnership income,
 
 see House v. American United Life Ins. Co.,
 
 499 F.3d 443, 446 n. 1 (5th Cir.2007). In this case, the husband testified that the $341,436 attributable to him as his share of GCOP’s 2006 earnings was retained by or reinvested in GCOP.
 

 This court has held that, in determining a parent’s gross income for child-support purposes, a trial court has the authority to consider
 
 all
 
 of a parent’s business income, irrespective of whether some of that business income is retained by or reinvested in the business, rather than actually distributed to the parent.
 

 “[I]n determining a parent’s ability to support his or her children a trial court can properly consider as the parent’s gross income the net income of that parent’s business, some of which is reinvested in the business, rather than the ‘owner’s draw’ taken by the parent.
 
 Klapal v. Brannon,
 
 610 So.2d 1167 (Ala.Civ.App.1992).”
 

 Hubbard v. Hall,
 
 739 So.2d 498, 499-500 (Ala.Civ.App.1999);
 
 see also Neny v. Neny,
 
 989 So.2d 565, 570-71 (Ala.Civ.App.2008);
 
 Brown v. Brown,
 
 960 So.2d 712, 716 (Ala.Civ.App.2006); and
 
 Puckett v. Summerford,
 
 706 So.2d 1257, 1258 (Ala.Civ.App.1997).
 
 But see Hubbard v. Hall,
 
 739 So.2d at 501 (Crawley, J., dissenting) (quoting
 
 Riepenhoff v. Riepenhoff,
 
 64 Ohio App.3d 135, 138, 580 N.E.2d 846, 848 (1990), for the proposition that “retained earnings should be considered as income to the payor if they are used ‘as a dodge to shelter ... income to avoid paying a higher amount of support,’ ” and citing
 
 Ochs v. Nelson,
 
 538 N.W.2d 527 (S.D.1995), in which the court explained that “whether to consider retained earnings as part of child-support obligor’s income is a case-by-case determination”).
 

 In our opinions allowing a trial court to consider as a parent’s gross income the net income of that parent’s business, the parent whose business income was being considered was either the sole shareholder or a majority owner of the business. In the present case, the husband is a minority shareholder of GCOP. We have never had the occasion to consider whether a minority shareholder’s proportionate share of the retained earnings of a subchapter S corporation can be attributed to him for purposes of child support.
 

 “The overwhelming majority of states that have addressed this issue have held that when the parent is a minority shareholder in a closely held or sub-chapter S corporation, and therefore does not control the decision on the distribution of earnings, then the retained earnings of the corporation cannot be attributed to him/her as income. The rationale behind these decisions is that parents should not be allowed to manipulate corporate assets and earnings to shield legitimate income from child support.
 

 
 *906
 
 “If, however, a parent has no control over the distribution of earnings, then obviously the possibility of this kind of manipulation is not present. In that case, the court will not consider the retained earnings as income to the parent.”
 

 Laura W. Morgan,
 
 Corporate or Partnership “Retained Earnings” as Income Under Child Support Guidelines,
 
 14 Divorce Litigation 205 (Nov.2002) (citations omitted).
 
 See also
 
 Michael W. Kalcheim,
 
 Are a Closely Held Corporation’s Retained Earnings Fair Game for a Divorcing Spouse?,
 
 95 Ill. B.J. 30 (2007); Alan Stephens, Annotation,
 
 Divorce and Separation: Attributing Undisclosed Income to Parent or Spouse for Purposes of Making Child or Spousal Support Award,
 
 70 A.L.R.4th 173 (1989).
 

 By ignoring the $341,436 that he reported as K-l income in 2006 and by positing that his 2006 income was only $83,592, the husband apparently assumed that his share of GCOP’s retained earnings should be disregarded for child-support purposes. The husband did not, however, make that argument to the trial court. Nor did he present any evidence to account for the disparity between GCOP’s retaining earnings of less than $50,000 for each of the four years preceding 2006 and its retaining earnings of almost seven times that amount in 2006. The trial court did not prepare and include a Form CS-42 indicating the manner in which it calculated child support, nor did it make any findings with respect to how it arrived at the child-support award. The judgment simply states that the husband shall pay to the wife $3,000 per month in child support. “[I]n the absence of specific findings of fact, appellate courts will assume that the trial court made those findings necessary to support its judgment, unless such findings would be clearly erroneous.”
 
 Ex parte Bryowsky,
 
 676 So.2d 1322, 1324 (Ala.1996).
 

 Given our prior decisions allowing a trial court to attribute the retained earnings of a closely held corporation to the parent shareholder for purposes of calculating gross income under the child-support guidelines, we cannot hold that the trial court’s implicit finding that the husband’s income substantially exceeded the uppermost limit of the child-support schedule was clearly erroneous. Moreover, even if the husband’s K-l income ($341,-436) for 2006 is subtracted from his adjusted gross income ($562,737) for 2006, the resulting amount ($221,301), when divided by 12 months ($18,441.75), still far exceeds the uppermost limit of the child-support schedule.
 

 “When the parties’ combined income exceeds the uppermost limit of the child-support schedule, the determination of a child-support obligation is within the trial court’s discretion.
 
 Floyd v. Abercrombie,
 
 816 So.2d 1051, 1057 (Ala.Civ.App.2001);
 
 Dyas v. Dyas,
 
 683 So.2d 971 (Ala.Civ.App.1995). ‘[A] trial court’s discretion is not unbridled and ... the amount of child support awarded must relate to the reasonable and necessary needs of the children as well as to the ability of the obligor to pay for those needs.’
 
 Dyas v. Dyas,
 
 683 So.2d at 973.
 

 “ “When the combined adjusted gross income exceeds the uppermost limit of the child support schedule, the amount of child support awarded must rationally relate to the reasonable and necessary needs of the child, taking into account the lifestyle to which the child was accustomed and the standard of living the child enjoyed before the divorce,
 
 and
 
 must reasonably relate to the obligor’s ability to pay for those needs.
 
 [Anonymous v. Anonymous,
 
 617 So.2d 694, 697 (Ala.Civ.
 
 *907
 
 App.1993) ]. To avoid a finding of an abuse of discretion on appeal, a trial court’s judgment of child support must satisfy both prongs.’
 

 “Dyas v. Dyas,
 
 683 So.2d at 973-74 (footnote omitted).”
 

 McGowin v. McGowin,
 
 991 So.2d 735, 741 (Ala.Civ.App.2008).
 

 At trial, the wife offered and the trial court admitted as the wife’s Exhibit 4 a document itemizing her monthly expenses that, she said, totaled $4,635.
 
 [3]
 
 She testified that Exhibit 4 represented a compilation of her actual living expenses for the two years since the parties’ separation:
 

 Description Expense
 

 Mortgage $1,650.00
 

 Food 400.00
 

 Clothing 350.00
 

 Laundry/Dry cleaning 50.00
 

 Auto expense 30.00
 

 Two cell phones 125.00
 

 Electricity 200.00
 

 Gas 250.00
 

 Water/Irrigation 125.00
 

 Satellite TV 125.00
 

 School lunches 30.00
 

 Medical co-pays & over-the-counter medication 20.00
 

 Dental 50.00
 

 Drugs 30.00
 

 Auto insurance 105.00
 

 Life insurance 70.00
 

 Medical insurance 250.00
 

 Pre-school tuition (Mary Grace) 200.00
 

 Extracurricular activities (gymnastics, etc.) 200.00
 

 Home/Property repair
 
 &
 
 maintenance 75.00
 

 The wife testified that she was requesting $2,500 per month in child support.
 

 In
 
 Tompkins v. Tompkins,
 
 843 So.2d 759 (Ala.Civ.App.2002), the stay-at-home wife submitted an itemized estimate of $11,570, representing the monthly living expenses for herself and one child. Mrs. Tompkins testified that she needed $3,000 per month for the child’s support; the trial court awarded her $2,500. This court affirmed, stating that because the record indicated that the child had participated in several extracurricular activities, that she had enjoyed the use of her parents’ two vacation homes, and that she had “had the benefit of a somewhat privileged lifestyle,” 843 So.2d at 763, the trial court’s child-support award was neither plainly and palpably wrong nor beyond the limits of the court’s discretion.
 
 See also TenEyck v. TenEyck,
 
 885 So.2d 146, 158 (Ala.Civ.App.2003) (holding that the wife’s testimony outlining the family living expenses constituted evidence from which the trial court could find that “ ‘the needs of the children exceed ... the maximum support pursuant to the guidelines’ ”).
 

 The husband in this case did not take issue with any of the items on the wife’s list of expenses. Although only three items on the list specifically relate to the children — $200 for preschool tuition for the youngest child, $200 for the expense of extracurricular activities, and $30 for school lunches — the trial court could reasonably have concluded that the wife’s expenses reflected the actual cost of housing, food, and other necessities for the wife and the three children, with no extravagance. The husband readily acknowledged at trial that the family had enjoyed “an upper-middle-elass lifestyle” during the parties’ marriage. Accordingly, we conclude that the child-support award does “relate to the reasonable and necessary needs of the child[ren], taking into account the lifestyle to which the child[ren were] accustomed and the standard of living the child[ren] enjoyed before the divorce,” as well as the husband’s ability to pay for those needs.
 
 Dyas v. Dyas,
 
 683 So.2d 971, 973 (Ala.Civ.App.1995).
 

 II.
 
 The Value of the Husband’s 25% Interest in GCOP
 

 Most of the testimony at trial related to the valuation of the husband’s 25% interest in GCOP. The wife presented the testimony of her business-valuation expert, James
 
 *908
 
 Butler, and the husband presented the testimony of his business-valuation expert, Mark Pawlowski. Both experts are certified public accountants and certified valuation analysts.
 

 The trial court determined that the value of the husband’s interest in GCOP was $500,000 and awarded the wife $250,000 as her share of the husband’s interest. Following the final day of testimony, the trial court explained to counsel for the parties what it intended to do and how it wanted the judgment drafted. With respect to the valuation of GCOP, the court stated:
 

 “I will award [the wife] some property settlement for the worth of GCOP. I think it’s worth more than [the husband’s expert] said and less than [the wife’s expert] said and I know that’s not a surprise to y’all. This is the one with the dueling accountants. But by the same token I’m not a mathematician so I mean I can’t look at either one of them and say your number is absolutely right and your number is completely and totally wrong forever. I don’t think either one of them is dead on.
 

 [[Image here]]
 

 “[The wife’s financial expert, Mr. Butler,] was saying it’s worth $654,000 and the [the husband’s financial expert, Mr. Pawlowski,] was saying that it was worth like $300,000 or less, so half of [the husband’s] interest — you know, I am figuring that his interest is in the 500,000-dollar neighborhood is what I am figuring. That his interest in GCOP is about $500,000 and so half of that is $250,000.”
 

 The husband contends that the trial court’s determination of value was incorrect because, he says, the court failed to apply marketability and minority-interest discounts
 
 [4]
 
 to the $654,000 valuation estimate provided by the wife’s financial expert.
 

 Both experts estimated GCOP’s book value at slightly more than $2.5 million. Butler, the wife’s expert, testified that the husband’s 25% share was worth, at a minimum, $638,000, which is 25% of the corporation’s book value. It is correct that, when Butler calculated the value of the husband’s interest
 
 at $638,000,
 
 he did not discount the value of the husband’s shares by using either a marketability or a minority-interest discount. He testified that minority-interest and marketability discounts generally do not exceed 30-35%, and he stated that
 
 for the $638,000 figure
 
 he did not apply any discounts, explaining that he “usually reserves [the application of any discounts] for the [trial] court.”
 

 Butler testified, however, that there are three ways to value a business other than by simply dividing the book value of the corporation by the shareholder’s proportionate share. He described the other methods as the asset approach, the market approach, and the income approach, and he testified that he used all three approaches in valuing GCOP. Butler said that, using the asset approach, GCOP was worth from $1.7 to $1.9 million. Using the market approach, Butler came up with a valuation of $3.7 to $4.4 million. Finally,
 
 *909
 
 using the income approach, GCOP was worth, according to Butler, $4.4 to $5.1 million.
 

 Pawlowski valued the husband’s share at $300,750. When Pawlowski was asked why he came up with a lower figure than Butler when both accountants agreed on the book value, Pawlowski explained:
 

 “[Y]ou have to consider a minority discount, lack of control — a potential buyer for those shares can’t access those assets, so that’s a lack-of-control discount or a minority-interest discount. And then on top of that you have to consider a marketability discount, because even if it could be sold it would need to be a time to sell them, so they’re not liquid, they’re not a liquid asset. And that’s how come a 25 percent interest or just in general a minority interest is generally going be worth even less than the pro rata share of a hundred percent book value.
 

 “Q. [By Mr. Wynne, the husband’s counsel]: So if I understand you right, the difference in your two calculations, based on book value is that you’re applying a marketability discount.
 

 “A. And the lack-of-control discount.”
 

 Despite Butler’s testimony that he usually reserved the application of any discounts for the trial court, Butler did testify to what the discounted value of the husband’s shares would be using a market approach, under which Butler had estimated GCOP’s value at $3.7 to $4.4 million. On cross-examination of Butler, the following occurred:
 

 “Q. [By Mr. Wynne]: When you just testified a moment ago that the [husband’s] 25[%] interest in the company [was] $934,000. That was based on a hundred percent interest of $3.73 million?
 

 “A. I don’t remember that I specified that amount, [but] 25 percent [of] 3.7 [million] is 900 plus thousand.
 

 “Q. In coming to that figure, you didn’t apply any discount, did you?
 

 “A. No, sir.
 

 “Q.
 
 But if you applied a 30 percent discount, that would be $280,000
 
 ?
 

 “A. Approximately, yes, sir.
 

 “Q.
 
 So that would bring that value down to $65⅛,000?
 

 “A. I cannot dispute that number, yes, sir.”
 

 (Emphasis added.) Based on the foregoing testimony, it is clear that Butler’s $654,000 estimate of the value of the husband’s 25% share of GCOP — the figure used by the trial court — included a 30% discount.
 

 III.
 
 The Trial Court’s Evidentiary Ruling
 

 During direct examination of the husband, the following occurred:
 

 “Q. Okay. Now, you heard Mr. Butler’s testimony?
 

 “A. I did.
 

 “Q. You’re an owner of the property that he was — testifying concerning?
 

 “A. Sure.
 

 “Q. Do you have any disagreements with Mr. Butler’s testimony?
 

 “A. The main — one of the main disagreements I have—
 

 “MR. SIMON [counsel for the wife]: I am going to object and here’s why: He is able to give his opinion as to the value. He did that, but he is not qualified as an expert to sharpshoot— Pawlowski can do that all he wants.
 

 “THE COURT: True. That’s true. That’s true.
 

 
 *910
 
 “MR. WYNNE [counsel for the husband]: But he’s an owner of the property.
 

 “THE COURT: He can say what he thinks his value is. He can’t say why he thinks Butler is wrong, only someone with all of the alphabet behind the name that Butler has can say why Butler is wrong.”
 

 The husband, citing Rule 701(b), Ala. R. Evid., contends that the trial court erred in sustaining the wife’s objection to his proposed testimony. The wife, citing
 
 Emerik Properties Corp. v. Jefferson County Board of Equalization,
 
 591 So.2d 496, 498 (Ala.Civ.App.1991), argues that only another expert can question the methodology used by an expert witness. The husband does not contend that because he has an accounting degree he was expertly qualified to question Butler’s valuation methodology or conclusion. Instead, the husband argues that his testimony as a lay witness would have been “helpful to a clear understanding of ... the determination of a fact in issue” within the meaning of Rule 701, Ala. R. Evid.
 

 Rule 701 provides:
 

 “If the witness is not testifying as an expert, the witness’s testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness’s testimony or the determination of a fact in issue.”
 

 “[T]he helpfulness test [of Rule 701] was intended to have a liberalizing impact upon the traditional historical rule” that generally prevented a lay witness from giving an opinion. 1 Charles W. Gamble,
 
 McElroy’s Alabama Evidence
 
 § 127.01(4) at 577 (5th ed.1996). “A fair amount of discretion is vested in the trial judge regarding the determination of whether opinions are helpful.” Rule 701, Ala. R. Evid. (Advisory Committee’s Notes). However, because the husband made no offer of proof indicating what his testimony would have shown and how that testimony would have been helpful, we cannot hold that the trial court exceeded the limits of its discretion by sustaining the wife’s objection to the husband’s testimony.
 

 “Generally, in order to preserve review of the trial court’s ruling sustaining an objection to proffered evidence, the party offering the evidence must make an offer of proof indicating what the evidence would have shown.
 
 Cherry v. Hill,
 
 283 Ala. 74, 214 So.2d 427 (1968). However, in situations in which the question disallowed indicates on its face the expected answer, no offer of proof is necessary to preserve error on appeal. Id.”
 

 Walton v. Walton,
 
 409 So.2d 858, 861 (Ala.Civ.App.1982). The question, “Do you have any disagreements with Mr. Butler’s testimony,” did not indicate on its face the expected answer; therefore, an offer of proof was necessary to preserve error on appeal.
 

 IV.
 
 The Periodic-Alimony and Property-Division Awards
 

 The husband contends that the trial court’s division of the marital assets was inequitable. He also claims that the trial court plainly and palpably exceeded the limits of its discretion in awarding the wife $2,000 per month in periodic alimony.
 

 “It is well settled that trial judges enjoy broad discretion in fashioning divorce judgments.”
 
 Ex parte Bland,
 
 796 So.2d 340, 343 (Ala.2000).
 

 “ ‘In reviewing the trial court’s judgment in a divorce case presented
 
 ore tenus,
 
 we will presume the judgment to be correct until it is shown to be plainly and palpably wrong or unjust.
 
 Brannon
 
 
 *911
 

 v. Brannon,
 
 477 So.2d 445 (Ala.Civ.App.1985).’ ”
 

 Id.
 
 (quoting
 
 Ex parte Jackson,
 
 567 So.2d 867, 868 (Ala.1990)). Issues concerning alimony and the division of marital property rest within the trial court’s discretion, and rulings on those matters will not be disturbed in the absence of a plain and palpable excess of discretion.
 
 Welch v. Welch,
 
 636 So.2d 464 (Ala.Civ.App.1994). Matters of alimony and property division are interrelated and a reviewing court must consider the entire judgment in determining whether the trial court exceeded its discretion on either issue.
 
 Willing v. Willing,
 
 655 So.2d 1064 (Ala.Civ.App.1995).
 

 “Each case is decided on its own peculiar facts and circumstances. Criteria which should be considered by the trial court when awarding alimony and dividing property include the length of the parties’ marriage, their ages, health, station in life, and future prospects; the sources, value, and type of property owned; the standard of living to which the parties have become accustomed during the marriage and the potential for maintaining that standard; and, in appropriate situations, the conduct of the parties with reference to the cause of divorce.”
 

 Currie v. Currie,
 
 550 So.2d 423, 425 (Ala.Civ.App.1989). A property division does not have to be equal, but it must be equitable,
 
 J.H.F. v. P.S.F.,
 
 835 So.2d 1024 (Ala.Civ.App.2002), and it must be “supported by the particular facts of the case,”
 
 Ex parte Elliott,
 
 782 So.2d 308, 311 (Ala.2000). The determination of what is equitable is a matter of discretion for the trial court.
 
 Carter v. Carter,
 
 934 So.2d 406 (Ala.Civ.App.2005).
 

 The record reveals that the husband committed adultery, and he does not challenge the trial court’s divorcing the parties on that ground. Accordingly, it was proper for the trial court to consider the husband’s fault in fashioning the property-division and periodic-alimony awards.
 
 Allen v. Allen,
 
 565 So.2d 653, 655-56 (Ala.Civ.App.1990). The record also reveals that the wife has not been employed except on a limited part-time basis for 12 years, based on the parties’ agreement that she would stay at home and care for their children. During the marriage, the parties enjoyed a very comfortable lifestyle, and, before their final separation, the husband had been able to leave his full-time employment and live on his investments. The wife received assets valued at approximately $1.3 million. The only indebtedness assigned to her was the $180,000 mortgage on her home.
 

 Property Awarded to the Wife
 

 Property Value Indebtedness
 

 Lot 13, Stillwood Point Clear’ $ 180,000 -0-
 

 Fairhope house 360,000 $180,000
 

 Colonial Bank investment account 178,000
 

 Property settlement for GCOP; interest 250,000
 

 Property settlement for husband’s sale of Beach Club property 60,000
 

 Wife’s IRA 275,000
 

 2004 Toyota Sequoia vehicle 24,000 -0-
 

 Total $1,327,000 $180,000
 

 The husband received assets valued at approximately $1.4 million, and he was assigned the indebtedness associated with three parcels of real property, two of which were titled in the name of the LLCs in which he held a 50% interest.
 

 Property Awarded to the Husband
 

 Property Value Indebtedness
 

 Lot 19, Woodlands Fairhope $ 300,000 $120,000
 

 
 *912
 
 His 1/2 interest in Lot 25, Cypress Bend owned by M & J 90,000 116.500
 

 His 1/2 interest in 618 Pinehurst owned by 1N3W 141,500 114.500
 

 2004 Ford F-160 truck 12,000 -0-
 

 1995 Model Bayliner boat 3,000 -0-
 

 Husband’s IRA 295,000
 

 NBC Security account 302,000
 

 First Gulf Bank account 39,000
 

 GCOP 250,000
 

 Total $1,432,500 $351,000
 

 Under the circumstances, the property division was not inequitable.
 

 The husband complains that the trial court “exceeded reasonable bounds” in awarding the wife $2,000 per month in periodic alimony. He argues that, because the wife is a relatively young 42-year-old woman who is well-equipped with two nursing degrees to reenter the job market, she can return to full-time employment when the parties’ youngest child reaches school age and, at most, needs only temporary rehabilitative alimony.
 

 The purpose of periodic alimony is “to preserve, as closely as possible, the economic status quo of the parties after the divorce as it existed during the marriage.”
 
 Horwitz v. Horwitz,
 
 739 So.2d 1118, 1122 (Ala.Civ.App.1999). In view of the length of the parties’ marriage and the standard of living they enjoyed during their marriage, the parties’ agreement that the wife would stay at home to rear the children, and the husband’s flagrant and repeated misconduct, we conclude that the trial court’s division of the marital property, its allocation of the debts, and its award of periodic alimony were not inequitable.
 
 See Ex parte Wallace,
 
 795 So.2d 719 (Ala.2000);
 
 McGowin v. McGowin,
 
 supra.
 

 The judgment of the Baldwin Circuit Court is affirmed.
 

 The wife’s request for an attorney’s fee on appeal is denied.
 

 AFFIRMED.
 

 THOMPSON, P.J., and PITTMAN, BRYAN, and MOORE, JJ., concur.
 

 [1]
 

 . GCOP is a subchapter S corporation in which the husband and his brother are 25% shareholders and another individual is a 50% shareholder. The husband's brother and the other individual operate the business.
 

 [2]
 

 . By order dated November 19, 2008, the Alabama Supreme Court amended Rule 32, Ala. R. Jud. Admin., including the child-support guidelines, effective January 1, 2009. By order dated February 25, 2009, the Alabama Supreme Court amended Rule 32(A)(4) and Rule 32(B)(7), Ala. R. Jud. Admin., effective March 1, 2009. Those amendments are not applicable to this case.
 

 [3]
 

 . The wife's expenses, in fact, total only $4,335.
 

 [4]
 

 . In
 
 Grelier v, Grelier,
 
 [Ms. 2060810, December 19, 2008], a divorce case, this court discussed the application of minority-interest and marketability discounts to the valuation of a husband's share of a closely held business, and noted that our supreme court had stated the following in
 
 Ex parte Baron Services, Inc.,
 
 874 So.2d 545, 549 (Ala.2003) (quoting
 
 Pueblo Bancorporation v. Lindoe, Inc.,
 
 63 P.3d 353, 361 (Colo.2003)): " ' "[Uder a fair market value standard a marketability discount should be applied because the court is, by definition, determining the price at which a specific allotment of shares would change hands between a willing buyer and a willing seller.” ' ” [On December 30, 2009, on rehearing, the Court of Civil Appeals withdrew its December 19, 2008, opinion and substituted a new one. The substituted opinion does not include the quoted material.]