On Application for Rehearing

PER CURIAM.
This court’s opinion of December 19, 2008, is withdrawn, and the following is substituted therefor.
Rebecca R. Grelier (“the wife”) appeals from a judgment divorcing her from Maximilian J. Grelier III (“the husband”); in particular, she challenges the trial court’s valuation of and division of certain business interests of the husband’s and the trial court’s failure to reserve jurisdiction to award periodic alimony in the future. The husband cross-appeals, asserting that the trial court erred in requiring him to pay certain fees and in ordering him to purchase an automobile for the wife.
The wife and the husband were married on May 13,1995; the parties’ two children, who were born during the marriage, were 4 and 8 years old at the time of trial. On June 28, 2004, the wife filed a complaint that sought, among other things, a divorce on the ground of adultery, an award of custody of the parties’ children, and an equitable division of the marital assets and debts. The husband filed an answer to the complaint 11 days later; he subsequently filed his own complaint in which he sought a divorce on the ground of incompatibility of temperament.
On June 10, 2005, the wife filed a motion requesting that the trial court appoint a special master for the purpose of auditing, examining, and inspecting the accounting books, records, and physical assets of the husband’s business interests and reporting its findings to the court. During a subse *1094 quent hearing, the trial court instructed the wife’s attorney to draft an order appointing a special master and to obtain the husband’s attorney’s approval of the proposed order before submitting the order to the trial court. On August 2, 2005, the trial court, using an order drafted by the wife’s attorney, appointed Gary Saliba to serve as a special master “for the purpose of identification and determination of the fair market value of all business entities in which the [husband] possesses any interest as well as analysis and determination of the fair market value of Queen Bee of Beverly Hills, the business operated by the [wife].” That order bore the signatures of the wife’s counsel and the husband’s counsel indicating their approval of the order at the time it was rendered by the trial court.
The trial court conducted an ore tenus proceeding over 6 days: November 13-15 and December 20-22, 2006. During the ore tenus hearing, the trial court heard testimony from the husband, the wife, the special master, and numerous witnesses; the testimony alone comprises over 1,800 pages of the 2,400-page record on appeal. Various documentary exhibits, including pertinent financial computations regarding the parties’ business interests, were also admitted into evidence.
Although the testimony revealed that both parties had earned undergraduate business degrees, the evidence also indicated that the wife had worked primarily as an accountant before the birth of the parties’ children and as a home-based entrepreneur following the birth of the children. In contrast, the husband had been self-employed, primarily as a commercial retail-property and office-property developer and broker, and he was serving as executive vice president of Chase Commercial Properties, LLC, at the time of trial. In addition, the husband regularly participated in real-estate and commercial ventures through a variety of closely held corporations: Flint Crossing, LLC; Trinity Associates, LLP; Chase Commercial Properties, LLC; Village Builders, Inc.; Rosemary Corners, LLC; Research Park Associates, LLC; and RMC Investors, LLC. Those entities, in turn, owned wholly or in part a number of other business entities, namely: Park Place Associates, LLC; Hughes Retail Associates, LLC; Bradford Associates, LLC; and The Falls at Grants Mill, LLC. In December 2005, while the divorce action was still pending, the husband and his three business partners (his father; his brother; and Remy Gross, his college friend) reorganized all the previously listed business entities under one entity, CG Partners, LLC, with each partner owning a 25% interest in that entity. The husband testified that consolidating the businesses was necessary to handle the outstanding debt that he and his father still owed from the financial failures of Village Builders, Inc., and The Ledges, an expensive residential-subdivision development. The husband also testified that during the pendency of the divorce action he had been forced to borrow $30,000 from Gross to employ his attorney and to pay child support. Additionally, the husband testified that he had borrowed a total of $40,000 from Chase Commercial Properties, LLC, to hire Sam Wessinger, a financial expert witness; he also stated that he owed the United States Internal Revenue Service $15,000.
The husband testified that he had earned $63,227 in 2005; he also stated that his annual income had peaked sometime between 1999 and 2000, when he had earned more than $100,000 in commissions. The husband testified that all of his various business interests had undergone financial trouble beginning in 2001; those troubles began with The Ledges, a residential subdivision whose lots and expensive houses failed to sell before the con *1095 struction loans were due to be paid. He stated that in 2003 he and his father had signed a promissory note representing the outstanding debt secured by that development and that as of August 1, 2005, the principal amount owed on that debt was $973,954.20. The husband testified that the parties had lived beyond their means throughout their marriage, defraying expenses through the use of credit cards, salary advances, and loans. At the time of trial, neither party had a retirement account; the wife testified that she had liquidated her retirement account to pay the parties’ living expenses during a period when they had no income.
The wife testified that during the parties’ worst financial period, which had occurred during the three years before the divorce complaint was filed, the parties had borrowed substantial sums from the wife’s mother and stepfather. The trial court admitted into evidence a promissory note executed by the parties and payable to the wife’s mother and stepfather on demand and no later than September 20, 2006, in the amount of $100,735.15; she stated that the total amount, including interest, owed on that note by the time of trial was $118,833.15. In addition, the wife testified that the parties had incurred large balances on joint credit-card accounts during the same period. She stated that at the time of the parties’ separation her father had paid several of the parties’ credit-card debts and was still owed $30,000 for those payments. Moreover, the wife testified that her mother had “rolled over” two other credit-card account balances onto her own credit-card accounts when the wife was unable to make required payments after the parties had separated; she stated that her mother was owed $8,800 in reimbursement for paying those marital debts.
The wife testified that her attorney had billed her a total amount of $50,345.29. By the time of trial, she had paid $31,770.74 to her attorney by borrowing from her mother, but she stated that she still owed $18,574.55 to her attorney. The husband testified that he had paid his attorneys over $30,000 by the time of trial, and, he stated, although he knew that he would owe more, he did not have a final bill from his attorneys.
The parties had purchased a lot in The Ledges in 1999 for approximately $165,000; they had built a house costing about $750,000 on that lot. Because the parties did not have enough money to complete construction of the house, they had borrowed $50,000 from the wife’s aunt, Betty Ladas, in order to finish building the house. At the time of trial, the parties owed $592,379.67 on the first mortgage and $74,070 on the second mortgage on the house; additionally, there were two liens recorded against the house totaling $10,500. Moreover, the wife testified that the house needed major repairs, including repair of a leaking roof, before the property could be sold.
The trial court entered a judgment divorcing the parties on January 8, 2007.[1] In that judgment, the trial court, among other things, awarded to the husband all of his business interests. The trial court’s judgment noted:
“In making an equitable distribution of the marital assets and liabilities accumulated by these parties during their marriage, and in determining the fair market value of the interest owned by the [husband] in the above entities, this *1096 Court finds that it is reasonable to apply a combined forty percent (40%) minority discount and marketability discount to the evaluations made by the Special Master in this case. In addition, this Court has taken into account the fact that some of the underlying projects owned by the above awarded entities have a negative fair market value; and ha[s] also taken into account the substantial debt for which the [husband] is personally liable, on a joint and severa-ble basis, which exceeds the total amount of $1,000,000.00. To do otherwise would be to ignore the reality of the financial condition of these parties.”
In the divorce judgment, the husband was also ordered to pay rehabilitative alimony to the wife in the amount of $1,500 per month for 36 months. In addition, the husband was instructed to pay the necessary educational expenses for the wife to renew her license to practice as a certified public accountant, so long as those expenses did not exceed $5,000. The judgment also ordered that the marital residence be sold and that the wife was to receive the first $200,000 of the proceeds from that sale; in the event that the net sale proceeds did not amount to $200,000, the judgment instructed the husband to pay any such deficiency in monthly installments of $1,000 per month as an additional property settlement.
The wife filed a timely notice of appeal; she alleges that the trial court erred in its valuation of the husband’s business interests, in its division of those business interests, and in its failure to reserve jurisdiction of the issue of periodic alimony. The husband cross-appealed, claiming in his docketing statement that the trial court had erred in ordering him to pay a portion of the wife’s attorney fees, to pay a majority of the special-master’s fee, and to purchase an automobile for the wife; however, the husband failed to present those issues or arguments in his appellate brief.[2] Therefore, we affirm the trial court’s judgment as to the husband’s cross-appeal, and we address only the wife’s allegations of error.
Our standard of review in divorce cases is well established. A trial court’s judgment based on ore tenus evidence will be presumed to be correct and will not be reversed on appeal absent a showing that the trial court acted outside its discretion or that the judgment is unsupported by the evidence so as to be plainly and palpably wrong. See Clements v. Clements, 990 So.2d 383, 389 (Ala.Civ.App.2007); see also Harmon v. Harmon, 928 So.2d 295, 298 (Ala.Civ.App.2005). However, questions of law are not subject to the ore tenus standard of review. See, e.g., Ex parte Perkins, 646 So.2d 46, 47 (Ala.1994), and L.R.M. v. D.M., 962 So.2d 864, 873 (Ala.Civ.App.2007).
The wife first asserts on appeal that the trial court erred in applying minority and marketability discounts when valuing the husband’s business interests. Heretofore, no Alabama case has addressed whether a divorce court should use minority and marketability discounts when assessing the value of a divorcing spouse’s interest in a closely held business organization. However, that issue has been addressed by many other jurisdictions. See Stephen A. Hess, Annotation, Use of Marketability Discounts in Valuing Closely Held Corporation or Its Stock, 16 A.L.R.6th 693 (2006). Many jurisdic *1097 tions, either by legislation or by caselaw, have adopted a “fair market value” standard by which the value of all marital property must be determined by gauging the price a willing buyer would pay to a willing seller in a hypothetical sales transaction. See, e.g., Crismon v. Crismon, 72 Ark.App. 116, 34 S.W.3d 763 (2000). Pursuant to that standard, it makes sense to apply minority and marketability discounts because those discounts reflect the economic reality that, unlike the case with publicly traded companies, no ready pool of willing buyers exists to purchase an interest in a private business organization that does not carry with it the ability to control that organization. See generally In re Marriage of Barlow, 111 Or.App. 179, 826 P.2d 18 (1992).
However, Alabama law has not adopted a “fair market value” standard for assessing marital property. Rather, under Alabama law, a trial court must determine the value of property with the only limitation being that the value must be equitable under the circumstances of the particular case. See generally Yohey v. Yohey, 890 So.2d 160 (Ala.Civ.App.2004). That standard implies that the valuation must be fair to all parties concerned. See generally Black’s Law Dictionary 578 (8th ed.2004) (defining “equitable distribution” as the “fair ... allocation” of marital property). In cases in which a divorce court does not contemplate the sale of a business in which one of the spouses holds a minority interest but, instead, intends that the business shall remain a going concern, it makes little sense to determine fair value by the measuring stick of a hypothetical sales price. That methodology would artificially reduce the value of the marital asset in almost every case, which would be unfair, i.e., inequitable, to the party receiving only a portion of the reduced value or the property equivalent to that reduced value but would be advantageous to the party retaining the business interest, including its actual value to him or her as the holder.
In Brown v. Brown, 348 N.J.Super. 466, 792 A.2d 463 (App.Div.2002), the court held that a divorce court correctly declined to apply minority and marketability discounts when valuing the husband’s minority interest in a family-owned floral business. The New Jersey court stated:
“ ‘A minority discount adjusts for lack of control over the business entity on the theory that non-controlling shares of stock are not worth their proportionate share of the firm’s value because they lack voting power to control corporate actions.... A marketability discount adjusts for a lack of liquidity in one’s interest in an entity, on the theory that there is a limited supply of potential buyers for stock in a closely-held corporation.’ Lawson [Mardon Wheaton, Inc. v. Smith], 160 N.J. [383,] 398-99, 734 A.2d 738 [ (1999) ].... Whether marketability or minority discounts are appropriate to the valuation of a less than controlling interest in the entity are questions of law which we review de novo, giving no special deference to the trial judge’s determination. Balsamides [v. Protameen Chems., Inc.], 160 N.J. [352,] 372-73, 734 A.2d 721 [ (1999) ]; Lawson, 160 N.J. at 398, 734 A.2d 738.”
348 N.J.Super. at 483, 792 A.2d at 473-74. Noting that the minority and marketability discounts are intended to account for the limited liquidity of minority interests in business entities, the court reasoned that the discounts should not apply when liquidity concerns are not at issue, such as when the business will continue to be an ongoing concern following the divorce. 348 N.J.Super. at 488, 792 A.2d at 477. The court held that, in such circumstances, “[t]he distinction between fair value and fair market value appears to us equally *1098 applicable in the valuation of one spouse’s interest in his family’s closely-held corporation for purposes of equitable distribution.” Id. The court explained that distinction at length in discussing the fair-value standard applicable to sales of stock by a dissenting minority shareholder:
“Statutory appraisal rights accorded to dissenting shareholders in New Jersey (and in most states) include the right to a determination of the ‘fair value’ (not ‘fair market value’) of their shares. N.J.S.A. 14A:11-3; see Bobbie J. Hollis, II, The Unfairness of Applying Lack of Marketability Discounts to Determine Fair Value in Dissenter’s Rights Cases, 25 J. Corp. L. 137,139 (1999), explaining the distinction between ‘fair value’ and ‘fair market value’:
“ ‘ “Fair value” is not the same as, or short-hand for, “fair market value.” “Fair value” carries with it the statutory purpose that shareholders be fairly compensated, which may or may not equate with the market’s judgment about the stock’s value. This is particularly appropriate in the close corporation setting where there is no ready market for the shares and consequently no fair market value.
“ ‘A closely-held corporation is one that has few shareholders and little market for the stock, or one that has an integration of ownership and management. When appraising shares of a close corporation, fair value cannot be fairly equated with the company’s fair market value. Close corporations by their nature have less value to outsiders, but at the same time their value may be even greater to other shareholders who want to keep the business in the form of a close corporation.’ ”
348 N.J.Super. at 487, 792 A.2d at 476.
Like New Jersey law, Alabama law recognizes the concept of “fair value” in the dissenting-shareholder context. See Ala. Code 1975, § 10-2B-13.01(4). Our statute is silent as to the applicability of a marketability discount, but in Ex parte Baron Services, Inc., 874 So.2d 545 (Ala.2003), the Alabama Supreme Court quoted with approval the explanation of the distinction between fair value and fair-market value contained in Brown. 874 So.2d at 549-50. The court held that fair-market value does not apply in dissenting-shareholder cases because the dissenting shareholder is not acting as a willing seller. 874 So.2d at 550. Rather, to accord the dissenting shareholder fair value, the trial court should determine the proportionate value of the company as a going concern without applying any discounts. Id. Because the Alabama Supreme Court has adopted the same reasoning that is applied in New Jersey in dissenting-shareholder cases, it seems reasonable to conclude that it would follow the same reasoning in divorce cases involving minority ownership of closely held business organizations. See Jay E. Fishman et al., Standards of Value-Theory and Application 167 (2007) (analogizing divorce cases to dissenting-shareholder cases). Thus, we conclude that the trial court erred in applying the minority and marketability discounts in this case.
Alabama law is firmly established that
“[mjatters of alimony and property division are interrelated, and the entire judgment must be considered in determining whether the trial court abused its discretion as to either of those issues. Willing v. Willing, 655 So.2d 1064 (Ala.Civ.App.1995).”
Henderson v. Henderson, 800 So.2d 595, 597 (Ala.Civ.App.2000). “[T]here is no rigid standard or mathematical formula on which a trial court must base its determi *1099 nation of alimony and the division of marital assets.” Yohey v. Yohey, 890 So.2d at 164. In this case, the trial court awarded the husband 100% of his interest in the various business entities in which he was involved. In so doing, the trial court considered the husband’s interest to be worth $602,108.40 instead of $1,003,514 because of the application of a combined 40% minority/marketability discount ($1,003,514 minus 40% discount = $602,108.40). Because we have determined that the trial court erred in its valuation of the husband’s closely held business interests, we reverse the divorce judgment and remand the case with instructions to reconsider its property division and its award of alimony in light of the proper valuation of the husband’s business interests. Because the entire judgment is hereby reversed, we pretermit discussion of the other issues raised in the wife’s appeal.
The husband’s request for an award of an attorney fee on appeal is denied.
APPLICATION GRANTED; OPINION OF DECEMBER 19, 2008, WITHDRAWN; OPINION SUBSTITUTED; REVERSED AND REMANDED WITH INSTRUCTIONS AS TO THE APPEAL; AFFIRMED AS TO THE CROSS-APPEAL.
THOMPSON, P.J., and BRYAN, THOMAS, and MOORE, JJ., concur.
PITTMAN, J., concurs in part and dissents in part, with writing.

. Although the husband admitted to having conducted an adulterous relationship during the latter part of the parties’ marriage, the trial court divorced the parties on the ground of incompatibility of temperament.

. This court has consistently held that when a party does not make an argument or cite any authority to support an allegation of error, that allegation of error is deemed waived on appeal. See Rule 28, Ala. R.App. P.; see also Cain v. Howorth, 877 So.2d 566, 581 (Ala. 2003).