PITTMAN, Judge.
C.M.R. (“the mother”), the mother of A.N.R. and A.C.R. (collectively referred to as “the children”), appeals from judgments entered by the Talladega Juvenile Court (“the juvenile court”) that, among' other things, determined that the children were dependent; awarded L.W., a woman who is not related to the mother or the children, custody of the children; and awarded the mother supervised visitation. We affirm.

Procedural History

In January 2013, C.J., the children’s maternal grandmother (“the maternal grandmother”), filed separate petitions alleging that each of the children was dependent and seeking custody. The maternal grandmother alleged that the children were dependent because, she said, the mother was unemployed and was unable to provide for the children financially; the father of the children (“the father”) had abandoned the children; and the Talladega County Department of Human Resources (“DHR”) had placed the children under a safety plan because, the maternal grandmother said, R.S., the mother’s boyfriend (“the boyfriend”), had been accused of sexually molesting the children. Later in January 2013, L.W. also filed separate petitions alleging that each of the children was dependent and seeking custody. L.W. alleged that the children were dependent because, she said, the mother had allowed the boyfriend to be around the children after he had been accused of sexually molesting the children and the mother had subjected the children to neglect by living in a residence with no electrical or water service for three months.
Although each of the four dependency petitions was docketed as a separate action, the juvenile court appointed a single guardian ad litem to protect the interests of the children in all four actions. The four actions were tried together in a single bench trial at which the juvenile court received evidence ore tenus. All the parties except the father appeared at trial and presented evidence. In April 2013, the juvenile court entered a judgment in each of the four actions; those judgments were, in all material respects, identical. The judgments determined that the children were dependent, awarded L.W. custody of the children, awarded the mother supervised visitation with the children, and denied the maternal grandmother’s custody claim. The juvenile court did not make any specific findings of fact or state its rationale for determining that the children were dependent. Following the entry of the judgments, the mother timely appealed.[1] Thereafter, the juvenile court certified that the record was adequate for appellate review pursuant to Rule 28(A)(1)(a), Ala. R. Juv. P.

Factual Background

The children are both girls. A.N.R., the older child, was born in 2004, and A.C.R., the younger child, was born in 2006. The mother testified that, when she was pregnant with the older child, she had waited until three days after her water had broken before she went to a hospital and that the older child had been delivered by emergency Cesarian section. The mother also testified that DHR had become involved with the family when the mother was leaving the hospital with the older child following her birth because someone had reported to DHR that the mother was taking the older child to an unsafe environ *373 ment.[2] According to the mother, DHR again became involved with the mother, the father, and the older child in 2005 because the mother and the father were both abusing drugs. The mother admitted that she had continued to abuse drugs while she was pregnant with the younger child and that she had left Talladega County before DHR completed its investigation regarding her drug use. The mother further testified that the younger child had been born in Limestone County and that the father had never been involved in the younger child’s life.
The mother testified that, sometime before October 2011, her paternal grandparents had purchased a mobile home (“the first mobile home”) in Sylaeauga and had allowed her, the children, and the boyfriend to live in it. The mother further testified that, in October 2011, DHR had placed the children under a safety plan because someone had accused the boyfriend of sexually molesting the children[3] and that the safety plan had required the boyfriend to move out of the first mobile home and had prohibited the mother from allowing the boyfriend to be around the children pending the completion of DHR’s investigation of the accusations against him. The mother also testified that, sometime after the boyfriend had moved out of the first mobile home and before May 2012, she had become unemployed and that, for several months, the only source of electricity at the first mobile home was an extension cord running from a neighbor’s house to the first mobile home.
The mother testified that, sometime before May 2012, DHR had orally informed her that it had closed its investigation regarding the accusations against the boyfriend and that she would receive written confirmation that DHR had closed its investigation in the mail; however, she admitted that she had never received written confirmation that DHR had closed its investigation regarding those accusations. The mother further testified that, in May 2012, her paternal grandparents had “kicked [her] out” of the first mobile home. The mother initially testified that she did not know why her paternal grandparents had compelled her to vacate the first mobile home in May 2012. However, she subsequently admitted that they had done so because the boyfriend had been coming there, although she insisted that he had been coming there “to get his things” and that “[h]e was not living there.” According to the mother, when her paternal grandparents compelled her to vacate the first mobile home, “nobody would take [her] in” except the boyfriend, so she and the children moved into the boyfriend’s mobile home in May 2012. The mother testified that she and the children had lived with the boyfriend at his mobile home from May 2012 until someone accused the boyfriend of molesting the children again in early December 2012.[4]
*374 The mother testified that, as a result of the December 2012 accusations that the boyfriend was sexually molesting the children, DHR had again become involved with the family and that the mother had asked L.W., a Mend from church with whom the mother had been close until the mother had moved into the boyfriend’s mobile home, to care for the children pursuant to a safety plan developed by DHR until the mother “could get on [her] feet.” The mother also testified that, in early December 2012, she had moved out of the boyfriend’s mobile home; that, when she moved out of the boyfriend’s mobile home, “[her] family would not help [her]” and had “abandoned” her; and that, for a couple of months after she had moved out of the boyfriend’s mobile home, she had been “on the streets living from couch to couch with church members and friends.” However, according to the mother, in February 2013, the maternal grandmother, who lives in Mobile County, came to Talladega County and took the mother to the maternal grandmother’s house to live. The mother testified that she was still living with the maternal grandmother when the actions were tried in March 2013, that she had gotten a job working as a housekeeper for the same company that employed the maternal grandmother, and that she was earning $10 per hour when the actions were tried.

Analysis

We will consider the mother’s second argument before considering her first argument. The mother’s second argument is that the judgments of the juvenile court should be reversed because, she says, the juvenile court’s determination that the children were dependent is not supported by clear and convincing evidence.
“ ‘Our standard of review of dependency determinations is well settled.
“ ‘ “A finding of dependency must be supported by clear and convincing evidence. § 12 — 15—65(f)[, Ala.Code 1975] [3]; M.M.S. v. D.W., 735 So.2d 1230, 1233 (Ala.Civ.App.1999). However, matters of dependency are within the sound discretion of the trial court, and a trial court’s ruling on a dependency action in which evidence is presented ore tenus will not be reversed absent a showing that the ruling was plainly and palpably wrong. R.G. v. Calhoun County Dep’t of Human Res., 716 So.2d 219 (Ala.Civ.App.1998); G.C. v. G.D., 712 So.2d 1091 (Ala.Civ.App.1997); and J.M. v. State Dep’t of Human Res., 686 So.2d 1253 (Ala.Civ.App.1996).”
“ ‘J.S.M. v. P.J., 902 So.2d 89, 95 (Ala. Civ.App.2004). This court has stated that clear and convincing evidence is
“ ‘ “ ‘[e]vidence that, when weighed against evidence in opposition, will produce in the mind of the trier of fact a firm conviction as to each essential element of the claim and a high probability as to the correctness of the conclusion. Proof by clear and convincing evidence requires a level of proof greater than a preponderance of the evidence or the substantial weight of the evidence, but less than beyond a reasonable doubt.’
““‘§ 6-ll-20[ (b) ](4), Ala.Code 1975.”
“ ‘L.M. v. D.D.F., 840 So.2d 171, 179 (Ala. Civ. App.2002).’
“L.A.C. v. T.S.C., 8 So.3d 322, 326-27 (Ala.Civ.App.2008).
“ “We are not allowed to substitute our judgment for that of the trial court, even when this court might have reached a different result, unless the trial court’s resolution of the facts is plainly and palpably wrong. *375 L.R.M. v. DM., 962 So.2d 864, 873-74 (Ala.Civ.App.2007) (citing Griggs v. Griggs, 638 So.2d 916, 918-19 (Ala. Civ.App.1994), quoting in turn Young v. Young, 376 So.2d 737, 739 (Ala.Civ. App.1979)). “‘[A]n appellate court may not substitute its judgment for that of the trial court. To do so would be to reweigh the evidence, which Alabama law does not allow.’ ” Ex parte R.E.C., 899 So.2d 272, 279 (Ala.2004) (quoting Ex parte Foley, 864 So.2d 1094, 1099 (Ala.2003)). When addressing the inability of an appellate court to reweigh the evidence and substitute its judgment for that of the trial court, our supreme court recognized:
““The trial court must be allowed to be the trial court; otherwise, we (appellate court judges and justices) risk going beyond the familiar surroundings of our appellate jurisdiction and into an area with which we are unfamiliar and for which we are ill-suited — factfinding.”
“Ex parte R.T.S., 771 So.2d 475, 477 (Ala.2000).’
“J.B. v. Cleburne County Dep’t of Human Res., 992 So.2d 34, 39-40 (Ala.Civ. App.2008).
“Section 12-15-102(8)a., Ala.Code 1975, defines a dependent child as:
“‘[a] child who has been adjudicated dependent by a juvenile court and is in need of care or supervision and meets any of the following circumstances:
“ ‘1. Whose parent, legal guardian, legal custodian, or other custodian subjects the child or any other child in the household to abuse, as defined in subdivision (2) of Section 12-15-301 or neglect as defined in subdivision (4) of Section 12-15-301, or allows the child to be so subjected.
“ ‘2. Who is without a parent, legal guardian, or legal custodian willing and able to provide for the care, support, or education of the child.
[[Image here]]
“ ‘6. Whose parent, legal guardian, legal custodian, or other custodian is unable or unwilling to discharge his or her responsibilities to and for the child.
[[Image here]]
“In determining whether a child is dependent, the juvenile court
‘“may consider any competent evidence relevant to the ability or willingness of the parent to discharge his or her responsibilities to the child
[[Image here]]
“M.E. v. Shelby County Dep’t of Human Res., 972 So.2d 89, 100-01 (Ala.Civ.App. 2007).
J.L. v. W.E., 64 So.3d 631, 634-36 (Ala.Civ. App.2010).
Section 12-15-102(8)a.l, Ala.Code 1975, provides, among other things, that a child whose parent allows the child to be subjected to abuse is a dependent child. The record establishes that, after the boyfriend had been accused of sexually molesting the children in October 2011, the mother moved into the boyfriend’s mobile home with the children in May 2012 and that the boyfriend was again accused of sexually molesting the children in December 2012. However, the record contains no evidence tending to prove that either the October 2011 or December 2012 accu *376 sations that the boyfriend had sexually molested the children were true.
None of the parties called the DHR employees who had investigated the allegations that the boyfriend had sexually molested the children to testify. L.W. did call Jennifer Howard, the DHR social worker who had been assigned to handle the children’s cases in February 2013, to testify. However, Howard did not have personal knowledge regarding DHR’s investigation of the accusations against the boyfriend. Although Howard had reviewed all DHR’s records regarding the children, an objection to her testifying to information that she had gleaned from her review of those records was sustained:
“THE COURT: This is the way I’ve always understood the law, and if I’m wrong on the law, then I’m wrong on it, but when you want to go into DHR’s records, you’re supposed to subpoena [the records] before court. There’s supposed to be a motion for protective order filed. We’re supposed to have a hearing on that motion before trial. The Court’s supposed to take all the records back into his office, go through it, do an in camera inspection and make a determination of what’s relevant and what’s not relevant. And then everybody in the case is supposed to have an opportunity to review all those records that the Court has deemed to be relevant before the trial of the case. Has that happened? Then it’s not allowed.”
Moreover, none of the parties called the boyfriend or the children to testify. The mother was the only witness called to testify who might have had personal knowledge concerning whether the boyfriend had sexually molested the children, and she testified that she did not have any knowledge regarding whether the allegations that the boyfriend had molested the children were true or false. Accordingly, because the record does not contain any evidence tending to prove that the boyfriend had indeed sexually molested the children, the record necessarily does not contain any evidence tending to prove that the mother had allowed the children to be subjected to sexual molestation by the boyfriend. Therefore, insofar as the dependency petitions alleged that the children were dependent on the ground that the mother had allowed the children to be subjected to sexual molestation by the boyfriend, the juvenile court could not have properly concluded that the children’s dependency had been established by clear and convincing evidence.
Section 12-15-102(8)a.2, Ala.Code 1975, provides, among other things, that a child who is without a parent able to provide for the care and support of the child is a dependent child. Moreover, § 12-15-102(8)a.6, Ala.Code 1975, provides that a child whose parent is unable to discharge his or her responsibilities to and for the child is a dependent child. The mother admitted that she had been unemployed from at least the spring of 2012 through January 2013; that, when she had moved out of the boyfriend’s mobile home in December 2012, “[her] family would not help [her]” and had “abandoned” her; and that, consequently, from approximately the first week in December 2012 until the maternal grandmother took her to the maternal grandmother’s house sometime in February 2013, the mother had been “on the streets living from couch to couch with church members and friends.” Moreover, the mother admitted that, in December 2012, she had asked L.W. to take the children and care for them pursuant to a safety plan developed by DHR until the mother “could get on [her] feet.” Furthermore, although the mother asserted at trial that the children had never been dependent, she has conceded on appeal “that the *377 children were dependent at the time the [dependency] petitions were filed [in January 2013]” (The mother’s principal brief at pp. 35 and 40), and merely asserts that the children were no longer dependent when the actions were tried in March 2013.
Although a party claiming that a child is dependent must prove that the child is dependent by clear and convincing evidence, an appellate court applies the ore tenus rule in reviewing a juvenile court’s judgment regarding a claim that a child is dependent. See J.C. v. State Dep’t of Human Res., 986 So.2d 1172, 1185 (Ala.Civ. App.2007) (“[I]n eases involving the termination of parental rights our appellate courts do not apply the clear-and-convincing-evidence standard of proof utilized by trial courts but, instead, use a settled standard of appellate review — the ore tenus rule.”). “Applying that standard of review, we address the question whether the juvenile court could have concluded that the children’s dependency had been established by clear and convincing evidence.” P.D. v. S.S., 67 So.3d 128, 132 (Ala.Civ. App.2011).
“Because appellate courts do not weigh evidence, particularly when ‘the assessment of the credibility of witnesses is involved,’ Knight[ v. Beverly Health Care Bay Manor Health Care Ctr.], 820 So.2d [92] at 102 [ (Ala.2001) ], we defer to the trial court’s factual findings. ‘The ore tenus rule reflects this deference; it accords a presumption of correctness to the trial court’s findings because of that court’s unique ability to observe the demeanor of witnesses.’ Id.; see also Fitzgerald v. Jeter, 428 So.2d 84, 85 (Ala.Civ.App.1983), and Ex parte Farm, 810 So.2d 631, 633 (Ala.2001).”
J.C., 986 So.2d at 1185. When, as in the present case, a juvenile court makes no specific findings of fact, “[an appellate court] will assume that the [juvenile court] made those findings necessary to support the judgment.” Transamerica Commercial Fin. Corp. v. AmSouth Bank, N.A., 608 So.2d 375, 378 (Ala.1992). Moreover, “[t]he ore tenus rule applies to those implicit findings, and, therefore, we must presume that those implicit findings are correct unless they are plainly and palpably wrong.” Engineered Cooling Seros., Inc. v. Star Serv., Inc. of Mobile, 108 So.3d 1022, 1027 (Ala.Civ.App.2012) (citing Transamerica, 608 So.2d at 378). Furthermore, under the ore tenus rule, “appellate courts are not allowed to substitute their own judgment for that of the trial court if the trial court’s decision is supported by reasonable inferences to be drawn from the evidence.” Ex parte Pie-lach, 681 So.2d 154,155 (Ala.1996).
The mother and the maternal grandmother both testified that the mother had gotten a job with the maternal grandmother’s employer sometime after she had begun living with the maternal grandmother in February 2013. The mother testified that she was earning $10 per hour when the actions were tried in March 2013, and both the mother and the maternal grandmother testified that the maternal grandmother had been providing the mother with a place to live since sometime in February 2013. That testimony (“the rehabilitation testimony”) tends to prove that the mother, with the assistance of the maternal grandmother, was financially able to care for and support the children and to provide them with a place to live when the actions were tried in March 2013.
However, the juvenile court was entitled to evaluate the credibility of the rehabilitation testimony.
“In ore tenus proceedings, the trial court is the sole judge of the facts and of the credibility of witnesses, and the trial court should accept only that testimony it considers to be worthy of belief. Os- *378 trander v. Ostrander, 517 So.2d 3 (Ala. Civ.App.1987). Further, in determining the weight to be accorded to the testimony of any witness, the trial court may consider the demeanor of the witness and the witness’s apparent candor or evasiveness. Ostrander, supra-It is not the province of this court to override the trial court’s observations. Brown[ v. Brown, 586 So.2d 919 (Ala.Civ.App. 1991) ].”
Woods v. Woods, 653 So.2d 312, 314 (Ala. Civ.App.1994). Thus, the juvenile court, as the sole judge of the facts and of the credibility of the witnesses, see Woods, supra, could have found that none of the rehabilitation testimony was credible and could have rejected it on that ground. In that regard, we note that none of the rehabilitation testimony was corroborated by any other evidence. If the juvenile court rejected all the rehabilitation testimony on the ground that it was not credible, it could have found that the mother was still unemployed and was still “on the streets living from couch to couch with church members and Mends” as she had been when the dependency petitions were filed in January 2013. The mother has conceded on appeal that the children were dependent due to the circumstances existing when the dependency petitions were filed. Thus, if the juvenile court rejected all the rehabilitation testimony on the ground that it was not credible, the juvenile court could have properly concluded that the circumstances existing when the actions were tried were no different than they had been in January 2013, when, the mother has conceded, the children were dependent. Accordingly, if the juvenile court rejected all the rehabilitation testimony on the ground that it was not credible, the juvenile court could properly have concluded that the record established by clear and convincing evidence that the children were dependent not only when the dependency petitions were filed but also when the actions were tried. See § 12-15-102(8)a.2; § 12-15-102(8)a.6; J.L., supra; J.C., supra; and Woods, supra.
Moreover, even if the juvenile court did not reject all the rehabilitation testimony on the ground that it was not credible, the juvenile court was entitled to “ ‘ “consider the past history of the family as well as the evidence pertaining to current conditions” ’ ” in determining whether the children were dependent when the actions were tried, A.M.F. v. Tuscaloosa Cnty. Dep’t of Human Res., 75 So.3d 1206, 1213 (Ala.Civ.App.2011) (quoting earlier cases), and, based on the evidence regarding the past history of the family, the juvenile court “could have determined that, to the extent the mother may have allegedly improved her [ability to provide care, support, and housing for the children], those efforts were merely last-minute efforts undertaken in anticipation of the impending [dependency] trial,” id., that would not continue following the entry of the judgments in the dependency actions. For example, the mother testified that, when her paternal grandparents compelled her to vacate the first mobile home in May 2012, “nobody would take [her] in” except the boyfriend. The juvenile court could have found from that testimony that the mother had asked the maternal grandmother to let the mother and the children live with the maternal grandmother in May 2012 and that the maternal grandmother had refused, which would indicate that the mother and the maternal grandmother have a very poor relationship. Moreover, the mother testified that, when she moved out of the boyfriend’s mobile home in December 2012, “[her] family would not help [her]” and had “abandoned” her and that, consequently, she had been “on the streets living from couch to couch with church members and friends” in De *379 cember 2012 and January 2013. The juvenile court could have found from that testimony that, in December 2012, the mother had asked the maternal grandmother to let the mother live with the maternal grandmother and that the maternal grandmother had refused,[5] which would indicate that the mother and the maternal grandmother have a very poor relationship. In addition, it is undisputed that, in December 2012, instead of asking the maternal grandmother, the mother had asked L.W. to care for the children pursuant to a safety plan developed by DHR, which tends to prove that the mother and the maternal grandmother have a very poor relationship.
Furthermore, although the maternal grandmother testified that she had a great relationship with the mother and the children, she subsequently admitted that the mother had not told the maternal grandmother where the mother and the children had moved when they had vacated the first mobile home, that the mother had not told the maternal grandmother how the maternal grandmother could contact the mother after the mother and the children vacated the first mobile home, and that the children had never spent the night at the maternal grandmother’s house. When the juvenile court confronted the maternal grandmother with the discrepancy between her testimony that she had a great relationship with the mother and the children, on the one hand, and her testimony that she neither knew where the mother and the children had gone after they had vacated the first mobile home nor knew how to contact them and that the children had never spent the night at the maternal grandmother’s house, on the other hand, the maternal grandmother ultimately admitted that she and the mother did not have a good relationship:
“THE COURT: ... [Yjou’re testifying to these things that just don’t make any sense to me.
“THE WITNESS: You’re right, it doesn’t make sense.
“THE COURT: And when it doesn’t make sense to me, I have to call you out on it. I don’t like when people get up here and testify to things that just don’t seem normal to me. They don’t add up. I add two and two together and come up with four, and your testimony is like adding two and 11 together and coming up with four. All I asked was did you think it was normal for you to have such a good relationship with your daughter and such a good relationship with your grandchildren for you not to know where they’re living? And you said you didn’t think it was normal, and then you started making excuses. And I asked *380 you do you still live in the same place being that they could have bought a stamp and wrote you a letter. They could have spent a dollar at a convenience store and called you. Don’t make excuses for your daughter’s behavior when all it takes is a dollar to correct it. I don’t know anybody who has a great relationship with their child and their grandchildren that if they’re going to move they’re not going to let their parents know where they’re going. That’s a strained relationship at best, and that’s not what you’ve testified to up here....
[[Image here]]
“THE COURT: My question to you is ... how can you testify in court that you have an outstanding relationship with your grandchildren if they’ve never spent the night in your home?
“THE WITNESS: I just never thought of that as a requirement.
“THE COURT: Then how do you establish that outstanding relationship? I mean, do you know how many teeth the tooth fairy has put up under their pillow?
“THE WITNESS: I can’t even count the number of teeth that my other grandchildren that I’m with all the time.
“THE COURT: But that’s what I’m saying. You see the changes in your other grandchildren. You know when they lose their front teeth and they’ve got a gap that makes them look funny. Do you know that about these grandchildren?
“THE WITNESS: I know they lose their teeth.
“THE COURT: But do you know that when it occurs?
■ “THE WITNESS: I might in the future if they could come and live with me.
“THE COURT: Well, now, you testified in the past. We’re not fortune tellers. I’m talking about the past here.
“THE WITNESS: I just don’t consider our relationship like strained or anything.
“THE COURT: So when your child moves with your two grandchildren and you don’t know where they live and you don’t have a contact number with them, you think that’s a good relationship.
“THE WITNESS: No, probably not.
“THE COURT: Probably?
“THE WITNESS: Okay, no.”
The juvenile court also could have considered the timing of the mother’s going to live with the maternal grandmother and the timing of the maternal grandmother’s assisting the mother in obtaining a job with the company that employed the maternal grandmother. The mother testified that, in May 2012, she and the children had needed a place to live, yet she testified that “nobody would take [her] in” except the boyfriend. The mother testified that, in May 2012, she was unemployed, yet there is no evidence in the record indicating that the maternal grandmother attempted to assist the mother in obtaining a job with the maternal grandmother’s employer in May 2012. Likewise, the mother testified that she was unemployed and had nowhere to live when she moved out of the boyfriend’s mobile home in December 2012, yet “[her] family would not help [her]” and had “abandoned” her. The mother further testified that, because her family would not help her, she had been “on the streets living from couch to couch with church members and friends” in December 2012 and January 2013, yet, in February 2013, shortly after L.W. had filed her dependency petitions, the mother suddenly went to live with the maternal grandmother and the maternal grandmother assisted the mother in obtaining a *381 job with the maternal grandmother’s employer. The juvenile court could have found from the timing of the mother’s going to live with the maternal grandmother and the timing of the maternal grandmother’s assisting the mother with obtaining a job with the maternal grandmother’s employer that the mother and the maternal grandmother acted as they did in February 2013 as a last-minute effort to defeat L.W.’s custody claim.
Thus, based on all the evidence regard7 ing the past history of the mother’s family, the juvenile court could have found that the mother and the maternal grandmother have a very poor relationship; that, in February 2013, they had a common goal, i.e., defeating L.W.’s custody claim; that, in an effort to defeat L.W.’s custody claim, the mother and the maternal grandmother had entered into an alliance of convenience pursuant to which the maternal grandmother had agreed to allow the mother to live with the maternal grandmother and to assist the mother in obtaining a job with the mother’s employer; and that, once the entry of the judgments in the dependency actions would eliminate the need for the alliance of convenience between the mother and the maternal grandmother, the alliance would dissolve, the maternal grandmother would no longer allow the mother to live in the maternal grandmother’s house, and the maternal grandmother would no longer provide the mother with financial assistance. See A.M.F., supra. Based on those findings, the juvenile court could have concluded that, despite the rehabilitation testimony, the record nonetheless established by clear and convincing evidence that the children were still dependent when the actions were tried. See § 12-15-102(8)a.2; § 12-16-102(8)a.6; A.M.F., supra; J.L., supra; J.C., supra; and Woods, supra.
We will now consider the mother’s first argument. The mother’s first argument is that the actions before us in this appeal were custody disputes rather than dependency actions and that, therefore, under Ex parte Terry, 494 So.2d 628 (AJa. 1986), she was entitled to custody of the children unless the evidence established that she was an unfit parent. In Terry, the supreme court stated:
“ ‘The prima facie right of a natural parent to the custody of his or her child, as against the right of custody in a nonparent, is grounded in the common law concept that the primary parental right of custody is in the best interest and welfare of the child as a matter of law. So strong is this presumption, absent a showing of voluntary forfeiture of that right, that it can be overcome only by a finding, supported by competent evidence, that the parent seeking custody is guilty of such misconduct or neglect to a degree which renders that parent an unfit and improper person to be entrusted with the care and upbringing of the child in question. Hanlon v. Mooney, 407 So.2d 559 (AJa.1981).’ ”
494 So.2d at 632 (quoting Ex parte Mathews, 428 So.2d 58, 59 (Ala.1983)). However, in P.D., 67 So.3d at 131-32, this court stated:
“Terry applies in child-custody disputes between a parent and nonparent; it does not apply if the child or children, the custody of whom is disputed, have been found to be dependent, as is the case here. See W.T.H. v. M.M.M., 915 So.2d 64, 70 (Ala.Civ.App.2005) (discussing the abundance of caselaw regarding the distinction between child-custody disputes and the dispositional phase of a dependency proceeding). Therefore, because the juvenile court found the children to be dependent, no finding of unfitness was necessary. See Anonymous v. Anonymous, 504 So.2d 289, 291 (Ala.Civ. App.1986) (stating that a determination *382 that a parent is unfit is unnecessary to award custody to a nonparent after a finding that a child is dependent).”
(Emphasis added.)
The actions that are before us in the present appeal were initiated by dependency petitions in which the maternal grandmother and L.W. alleged that the children were dependent. L.W. asserted that the children were dependent at trial and introduced evidence at trial tending to prove that the children were dependent. Moreover, the juvenile court expressly determined in its judgments in all four actions that the children were dependent. In addition, the mother has conceded on appeal that the children were dependent when the four dependency petitions were filed. Finally, we have concluded that, based on the record that was before it, the juvenile court could reasonably have determined that the children’s dependency had been established by clear and convincing evidence. See §§ 12-15-102(8)a.2 and 12-15-102(8)a.6. Accordingly, the mother’s argument that the actions before us in the present appeal were custody disputes rather than dependency actions has no merit. See P.D., supra. Therefore, we affirm the judgments of the juvenile court.
AFFIRMED.
THOMPSON, P.J., and THOMAS and DONALDSON, JJ., concur in the result, without writings.
MOORE, J., concurs in the result, with writing.

. Neither the father nor the maternal grandmother filed a notice of appeal.

.The record does not indicate who reported to DHR that the mother was taking the older child to an unsafe place, does not indicate where the mother intended to take the older child on that occasion, and does not indicate why the reporter considered that place unsafe. The record indicates that DHR removed the older child from the mother’s custody when the older child was a “toddler”; however, the word “toddler” implies that this occurred when the child was learning to walk rather than when she was a newborn baby. Assuming that is the case, the record does not indicate what, if any, action DHR took as a result of the report that the mother was taking the older child from the hospital to an unsafe place.

. The record does not indicate who accused the boyfriend of sexually molesting the children in October 2011.

. The record does not indicate who accused the boyfriend of sexually molesting the children in December 2012.

“3The requirement that a finding of dependency must be supported by clear and convincing evidence before the dis-positional phase of a dependency proceeding is now codified at § 12-15-311(a), Ala.Code 1975.”

. Later in the mother's testimony, the juvenile court asked the mother why she had not gone to live with the maternal grandmother in December 2012, and, in response, the mother testified that the maternal grandmother had tried to persuade the mother to come live with the maternal grandmother when the mother needed a place to live in December 2012 and that the mother had declined because she was afraid that DHR would accuse her of abandoning the children if she moved out of Talladega County. However, the mother’s testimony that the maternal grandmother had tried to persuade the mother to come live with the maternal grandmother in December 2012 is contradicted by the mother’s testimony that, when she needed a place to live in December 2012, “[her] family would not help [her]” and had "abandoned” her. The juvenile court, as the sole judge of the facts and of the credibility of the witnesses, see Woods, supra, could have resolved that conflict in the mother’s testimony by finding that the maternal grandmother had refused to help the mother in December 2012. Moreover, the mother’s moving from Talladega County to live with the maternal grandmother in February 2013 belies the mother’s testimony that she had not done so in December 2012 because she was afraid DHR would accuse her of abandoning the children.